2007 WY 165

**Emilio Felix TENIENTE, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

No. 05–171.

Supreme Court of Wyoming.

Oct. 18, 2007.

514

Representing Appellant: Kenneth M. Koski, State Public Defender; Donna D. Domonkos, Appellate Counsel; and Tina N. Kerin, Senior Assistant Appellate Counsel. Argument by Ms. Kerin.

Representing Appellee: Patrick J. Crank, Wyoming Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; and Leda M. Pojman, Assistant Attorney General. Argument by Ms. Pojman.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, and BURKE, JJ.

HILL, Justice.

[¶ 1] A jury convicted Emilio Teniente of first-degree murder and conspiring to commit murder in the death of Joseph Lopez. On appeal, Teniente argues that multiple issues arose during trial which affected his right to a fair trial. We disagree, and affirm.

## ISSUES

[¶ 2] Both parties similarly phrase eight issues. Teniente's phrasing is as follows:

1. Did reversible error occur when the trial court failed to make inquiry into the effect of threats of retaliation made to the jurors?

2. Did prosecutorial misconduct occur, warranting reversal?

3. Did the trial court err in admitting irrelevant information of alleged gang activity?

4. Was [Teniente] denied a fair trial, due to the receipt of hearsay testimony?

5. Was [Teniente] denied his right to confrontation by the elicitation of testimonial hearsay?

6. Did the trial court err in denying [Teniente's] motion for mistrial after the prosecutor commented on [Teniente's] exercise of his right to silence?

7. Is Wyoming Statute § 6–2–101(c) unconstitutionally vague and violative of due process, and is it unconstitutional as applied to [Teniente]?

8. Does cumulative error warrant reversal?

## FACTS

[¶ 3] The facts of this case are set out in detail in *Magallanes v. State*, 2006 WY 119, ¶¶ 3–10, 142 P.3d 1147, 1149–51 (Wyo.2006):

During the evening hours of January 17, 2004, Joseph Lopez and his younger brother, Anthony, went to the home of Emilio Teniente in Greeley, Colorado. There, they met Bobby Rojas, Magallanes and his brother, Jesse Magallanes (hereinafter "Jesse"). The six young men sat around drinking, conversing, and listening to music. After a period of time, Teniente, Rojas, Lopez, Magallanes and Jesse decided to drive to Cheyenne to party.

Jesse drove that evening, and Teniente occupied the front passenger seat. In the rear, Magallanes sat behind Jesse, Lopez sat in the middle, and Rojas sat behind Teniente. At some point during the drive to Cheyenne, Lopez made an inflammatory comment to Magallanes about his mother. Magallanes became angry and began punching Lopez. Thereafter, punches were thrown by all three occupants of the back seat. When the men reached Cheyenne, Jesse stopped the car, and he and Magallanes pulled Lopez out of the vehicle. Apparently believing they intended to leave Lopez there, Teniente told them to put Lopez back in the car because "he knows who I am."

After placing Lopez back in the car, the men went to the house where Teniente's sister Sophia lived. Sophia immediately noticed blood on Lopez's face and admonished the men for fighting. She then helped Lopez clean up and gave him a clean shirt to wear while she washed the one he had been wearing. After that,

things calmed down between the men and they sat around drinking and talking with Sophia and one of her female friends, Vanessa Hernandez. Approximately two hours later, Teniente suggested they return to Greeley, and the five men left Sophia's house.[1]

Shortly thereafter, Lopez began to scold the others for hitting him earlier. He told them they should have killed him and that they needed to take care of him before they returned to Greeley because his family would get revenge for the beating he had taken. At that point, Magallanes struck Lopez, and Teniente pulled out his .25 caliber semi-automatic pistol, pointed it at Lopez's head and told him to shut up. Teniente then directed Jesse to drive to Campstool Road. When they arrived at the College Drive overpass on Campstool Road, Magallanes and Teniente had Jesse stop the vehicle under the bridge.

Magallanes removed Lopez from the car and started beating and kicking him, eventually driving him to the ground. By this time, Jesse and Teniente were outside the vehicle. While Jesse attempted to stop the fracas, Teniente passed his pistol to Magallanes and told him to "shoot that guy." Magallanes then shot Lopez twice in the head, once above the left ear and once toward the back of the head. The four men left Lopez on the road and returned to Sophia's house, where Magallanes and his brother dropped off Teniente and Rojas before heading home. Approximately forty-five minutes later, around 2:00 a.m., Sophia and Hernandez drove Teniente and Rojas back to Greeley.

Shortly before 2:00 a.m., Michael Hampton, a security officer for Frontier Refinery, left the refinery and drove east on Campstool Road. As he approached the area of the overpass, he saw what appeared to be debris on the roadway and attempted unsuccessfully to swerve and avoid it. After hitting it, Hampton stopped his vehicle and discovered that the object was the body of a young man. The

Laramie County Sheriff's Office was immediately contacted.

During the ensuing investigation, law enforcement learned that Lopez had accompanied Teniente and others to Cheyenne the previous evening. Law enforcement's investigation into Lopez's murder, however, was hampered by an orchestrated effort to cover up what had taken place in Cheyenne. As part of the cover-up, Rojas, Jesse, Sophia and Hernandez told a similar fabricated story that Lopez had left Sophia's home by himself and never returned, and conveniently failed to mention Magallanes' presence in Cheyenne on the night in question. Those fabrications started to unravel when Sophia was arrested for possession of a controlled substance.

Based on information obtained from the ongoing investigation, the State charged Magallanes with the premeditated murder of Lopez and with conspiring with Teniente to commit that murder. In September 2004, a jury found him guilty on both charges. The district court sentenced Magallanes to concurrent terms of life imprisonment without the possibility of parole. This appeal followed.

For purposes of the instant appeal, we will set out additional facts as they are pertinent to the issues raised.

## ARGUMENT

Issue I—*Juror Note*

[¶ 4] In his first issue, Teniente argues that reversible error occurred when the trial court failed to inquire into a note it received from the jury. The State contends that the trial court responded appropriately to the note and properly exercised its discretion in its treatment of it.

[¶ 5] During its deliberation, the jury sent a note to the court, which read:

Dear Judge Grant:

During our deliberation some concerns have arose about the safety and any retaliation of either family, towards any of us or

---

1. Jesse, once again, drove the car and the other men sat in the seats they occupied on the trip to Cheyenne.

our families. Some of us have been approached by some of the family members.

Please advise us of our course of action.

Thank you.

Respectfully yours,

The Jury.

[¶ 6] The note referred to a specific instance when a female juror was approached during trial by Teniente's girlfriend in a public restroom. The girlfriend first introduced herself, and then mentioned that she had just had Teniente's baby and that "things were really hard." The juror did not respond, terminated contact, and immediately notified the bailiff.[2] After learning of the juror's contact with Teniente's girlfriend, the court informed the juror, via the bailiff, that it was comfortable with her continued service on the jury, as long as the juror was also comfortable with continuing. The juror testified to feeling comfortable continuing, but admitted the contact did make her "a bit nervous."

■■■ [¶ 7] Teniente contends that this incident improperly affected his right to a fair trial. In analyzing this issue, we turn to a legal principle established both in our court and the United States Supreme Court. It is well settled that:

> [i]n a criminal case, any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties. The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant.

Martinez v. State, 2006 WY 20, 28, 128 P.3d 652, 665 (Wyo.2006) (quoting Remmer v. United States, 347 U.S. 227, 229, 74 S.Ct. 450, 98 L.Ed. 654 (1954)). Martinez further points out that in order to implicate such a presumption, there must be some "quantum of evidence indicating that an out-of-court communication or contact occurred and that it concerned 'the matter pending before the jury.'" Martinez, ¶ 29, 128 P.3d at 665.

■■■ [¶ 8] Furthermore, in Skinner v. State, 2001 WY 102, 33 P.3d 758 (Wyo.2001) we cited this language with favor:

> When a trial court is apprised of the fact that extrinsic influence may have tainted the trial, the proper remedy is a hearing to determine the circumstances of the improper contact and the extent of the prejudice, if any, to the defendant. The court's questioning of a juror who is the recipient of extraneous information is limited to the circumstances and nature of the improper contact, as Fed.R.Evid. 606(b) precludes the court from delving into the subjective effect of the contact on the juror's decision-making. Accordingly, an objective test should be applied in making an assessment of whether the defendant was prejudiced by the extraneous information. The court "should assess the 'possibility of prejudice' by reviewing the entire record, analyzing the substance of the extrinsic evidence and compa" ring it to that information of which the jurors were aware.' United States v. Weiss, 752 F.2d 777, 783 (2d Cir.), cert. denied, 474 U.S. 944, 106 S.Ct. 308, 88 L.Ed.2d 285 (1985).

Id., ¶ 13, 33 P.3d at 763 (citing Sisneros v. City of Laramie, 773 P.2d 933, 936 (Wyo. 1989)). In other words, a mere showing of improper communication is not sufficient—prejudice must also be shown. Id. Furthermore, a new trial is not required every time a juror is placed in a potentially compromising situation:

---

**2.** This information was developed at an October 2006 remand hearing. Teniente initially filed his brief on appeal in January 2006, when the record regarding the note consisted only of the note and no development of the court's treatment of it. At that time, the record was silent as to what, if any, action the court took in response to the note. Accordingly, concurrent with filing his brief on appeal, Teniente also filed a Motion for Partial Remand for purposes of developing the record regarding the note. As a result, on July 13, 2006, this Court ordered a stay in the briefing schedule and remanded the matter back to the district court to develop the record regarding the jury's note, pursuant to Calene v. State, 846 P.2d 679, 692 (Wyo.1993).

[I]t is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote. Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen.

*Skinner*, ¶ 14, 33 P.3d at 763 (citing *Smith v. Phillips*, 455 U.S. 209, 217, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982)). *Gunnett v. State*, 2005 WY 8, ¶ 25, 104 P.3d 775, 781 (Wyo.2005), notes that,

[i]n such circumstances, many courts have abandoned the "presumption" mechanism in favor of common sense inquiries into the likely effect of the information or influences on the average juror:

Under all of these standards, the court must attempt to draw inferences as to the probable effects of the extraneous information or outside influence in light of objectively apparent facts about the context in which those matters came to the jury's attention. Thus, probable effect is estimated in light of the importance of the issue to which the information or influence related, the nature of the information or influence, the strength of the admitted evidence supporting the verdict, the number of jurors exposed to the information or influence, when the jury was exposed to the information or influence, how long the jury discussed these matters during deliberations, the manner in which the court dealt with the information at trial, and any other matters which logically might have a bearing on the effect of the information or influence on the jury.

27 Charles Alan Wright & Victor James Gold, Federal Practice and Procedure: Evidence, § 6075 at 469–71 [(1990) ]; *and see Wiser v. People*, 732 P.2d 1139, 1142–44 (Colo.1987).

[¶ 9] Here, lessons from both *Skinner* and *Gunnett* undeniably hold true. As previously noted, after the female juror was approached by Teniente's girlfriend, the juror immediately terminated the contact and notified the bailiff. The court was informed and through the bailiff contacted the juror to ensure that her level of ease at serving on Teniente's jury was not compromised. Furthermore, the district court spoke with counsel about ensuring the avoidance of any contact between families and jurors after the verdict was read and specifically answered juror questions and concerns about their safety after trial. After reviewing the record developed specifically to address this issue, we confidently conclude that the district court's actions regarding the note were altogether appropriate.

Issue II—*Prosecutorial Misconduct*

[¶ 10] Teniente claims that several instances of prosecutorial misconduct occurred in this case. Where there has been no objection below, claims of prosecutorial misconduct are reviewed for plain error.

First, the record must be clear as to the incident which is alleged as error. Second, the party claiming the error amounted to plain error must demonstrate that a clear and unequivocal rule of law was violated. Finally, that party must prove a substantial right has been denied him and, as a result, he has been materially prejudiced.

*Farmer v. State*, 2005 WY 162, ¶ 26, 124 P.3d 699, 709 (Wyo.2005) (quoting *Wilks v. State*, 2002 WY 100, ¶ 7, 49 P.3d 975, 981 (Wyo. 2002)). Furthermore, the defendant bears the burden of proving prejudice. *Id.*

[¶ 11] However, where there has been an objection below, claims of prosecutorial misconduct are reviewed for harmless error, which occurs if

there is a reasonable possibility that the verdict might have been more favorable to the defendant if the error had never occurred. To demonstrate harmful error, the defendant must show prejudice under 'circumstances which manifest inherent unfairness and injustice or conduct which offends the public sense of fair play.'

*Butcher v. State*, 2005 WY 146, ¶ 38, 123 P.3d 543, 554 (Wyo.2005) (citations omitted).

[¶ 12] Finally, we note that when reviewing claims of prosecutorial misconduct, the prosecutor's comments and arguments must be reviewed in the context of the entire record, and Teniente has the bur-

den of proving that he was so prejudiced by the alleged misconduct that he was denied his right to a fair trial. *Butcher,* ¶ 39, 123 P.3d at 555. The propriety of any comment made during closing argument is measured in the context of the entire argument. *Virgilio v. State,* 834 P.2d 1125, 1127 (Wyo.1992). Reversal is not warranted unless a reasonable probability exists that absent the error, the appellant may have enjoyed a more favorable verdict. *Id.*

## DISCUSSION

[¶ 13] Teniente claims that five instances of prosecutorial misconduct occurred during his trial. Each will be discussed separately with the appropriate standard of review applied.

### a. Conviction of Co–Defendant

[¶ 14] First, Teniente argues that prosecutorial misconduct occurred when the prosecutor referred to Eddie Magallanes' conviction during the cross-examination of a witness and referenced that same testimony during rebuttal closing argument. The State admits that it is a general rule that when two persons are indicted for separate offenses growing out of the same circumstance, the fact that one has pleaded guilty is inadmissible against the other. See *Kwallek v. State,* 596 P.2d 1372, 1375–1376 (Wyo.1979). Also, the State admits that prejudice occurs when the accused timely objects and requests curative action by the trial court. However, the State contends that because Teniente did not object to the alleged error, and as a result has the burden of proving plain error, that his argument fails because the requisite application of plain error falls short.

[¶ 15] We begin with the problematic testimony of which Teniente complains:

Prosecutor: Mr. Gutierrez, I guess begin by explaining to me Magallanes versus Gutierriez. You're a half brother of—

Gutierrez: Yes, sir.

Prosecutor: Now, you say Jesse called you on the phone?

Gutierrez: Yes, sir.

Prosecutor: When you were in some state, you don't remember where?

Gutierrez: If you tell me the date, I probably got it on paper showing where because of Qual–Com, it shows every state, every time you use that, where you were at.

Prosecutor: So you brought that with you today. What's it say?

Gutierrez: I don't know. Tell me what date, and I'll get the paper and tell you.

Prosecutor: I thought you were the one telling us he called. Don't you know what day he called you?

Gutierrez: A year ago? Come on. Not even you could remember, okay?

Prosecutor: So you're saying sometime in the last year Jesse called you and said he killed someone?

Gutierrez: Yes, that's all he said, okay?

Prosecutor: Was that before or after Eddie was charged?

Gutierrez: That was before.

Prosecutor: Before Eddie was charged?

Gutierrez: I think so, yes, sir.

Prosecutor: And then Eddie got charged?

Gutierrez: Yes.

Prosecutor: In fact—

Gutierrez: I don't know when Eddie got charged.

Prosecutor: Right, but he came back, he was jailed here in April, and you visited him in jail?

Gutierrez: Yes, I have—I have a couple of times, but I don't have too much to do with him because I'm always on the road.

Prosecutor: And you knew Eddie was charged with killing someone, didn't you?

Gutierrez: Yeah, just what I read when I came—I took a week off for his trial, and you had me kicked out of the courtroom.

Prosecutor: And you sat through his trial, didn't you?

Gutierrez: No, I didn't. You kicked me out of the courtroom. Remember that?

Prosecutor: You were present when the jury was—came back and found Eddie guilty?

Gutierrez: No, I was not here.

Prosecutor: Do you remember Eddie was found guilty?

Gutierrez: Yeah, because my wife was here, and she told me.

Prosecutor: You knew he was charged with killing Joseph Lopez?

Gutierrez: Yes, I did.

[¶ 16] During rebuttal closing, the prosecutor referenced this same testimony by saying,

It's like, wait a minute. "Eddie's charged with a murder, and you're saying all this time you knew Jesse said he did it? You sit through Eddie's trial, watch him get convicted." "Jesse said he did it." Where was he? Where did this come from? Why is he here? This is the family picking sides.

[¶ 17] During trial, the court ruled and the prosecution agreed that testimony and/or evidence regarding the conviction of Eddie Magallanes was inadmissible during the State's case in chief. Accordingly, the State refrained from presenting any testimony or evidence of Magallanes' conviction during its case in chief and went so far as instructing its witnesses to not make any reference to that conviction. Nevertheless, the prosecutor did reference the conviction, and we must determine whether or not Teniente was so prejudiced by the reference as to warrant a reversal.

[¶ 18] There are several non-exhaustive factors we weigh when evaluating if there was prejudicial plain error at the trial level by reference to a co-defendant's conviction:

1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and prejudice the accused;

2) whether the remarks were isolated or extensive;

3) the strength of competent proof to establish guilt, absent the remarks;

4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters;

5) the presence or absence of a limiting instruction;

6) whether there was a proper purpose for introducing the conviction;

7) whether the conviction was improperly emphasized;

8) whether the conviction was used as substantive evidence of guilt;

9) whether the error was invited by defense counsel;

10) whether the failure to object could have been the result of tactical decisions; and

11) whether, in light of all the evidence, the error was harmless.

*Mazurek v. State*, 10 P.3d 531, 539 (Wyo. 2000). In applying these factors to the Teniente facts, we do not believe that he suffered material prejudice as a result of the prosecutor's remarks. Under the circumstances, it does not appear that the remarks had a tendency to mislead the jury or prejudice the accused, as the remarks were not extensive. Additionally, substantial evidence existed for Teniente's convictions, and even without the remarks made by the prosecutor, the strength of the evidence was substantial.

[¶ 19] Given the substantial evidence against Teniente, it does not appear that the prosecutor's comments were deliberately placed before the jury to divert attention to extraneous matters. We can plainly gather from the record on appeal that the prosecutor was trying to develop the theory that Gutierrez never came forward with information that was pertinent to the crime, not trying to imply that Teniente was guilty because his co-defendant was also found guilty.

[¶ 20] We do not see how the asserted error could have been invited by defense counsel but, nevertheless, our review of the record shows that the conviction was not improperly emphasized, nor was it used as substantive evidence of Teniente's guilt. It is thus apparent that, in light of all the evidence, the error was harmless, and plain error did not occur in this instance.

**b. Comments on Right to Remain Silent**

[¶ 21] Teniente next argues that at trial, the prosecutor improperly commented on his right to remain silent during the State's closing argument, which follows in pertinent part:

PROSECUTOR: ... But Emilio, he just stays—last statement he gave this detec-

tive on January 26th, "I was at the Stinson house, and I told Eddie and Jesse to take Joe home. That's all I know." That's his first. That's what he stuck by. That's where we stand today. That's the only statement we have out of Emilio Teniente.

DEFENSE COUNSEL: Your Honor, may we approach?

BENCH CONFERENCE

DEFENSE COUNSEL: Your Honor, I object to [Prosecutor] saying that that is the only statement that we have for Mr. Teniente. That is a comment on his right to remain silent. That is a comment on him not testifying at this trial, and it is improper and I hate to do it, and I hate to do it, but I move for a mistrial.

COURT: Motion for mistrial denied. I think in the context, the statement didn't violate the rule.

PROSECUTOR: I'll clarify it.

END OF BENCH CONFERENCE

PROSECUTOR: Statement Mr. Teniente—the 26th was the last statement to law enforcement, first one to Brady Olson, second one January 19th to this detective, third and last to law enforcement January 26th, "Joe went out the door with Eddie and Jesse[.]"

[¶ 22] As the trial transcript reflects, defense counsel objected to the remarks, prompting our review to be harmless error. Under this standard, error occurs and is harmful if there is a reasonable possibility that the verdict might have been more favorable to the defendant if the error had never occurred. *Butcher*, ¶ 38, 123 P.3d at 554. To demonstrate harmful error, the defendant must show prejudice under circumstances which manifest inherent unfairness and injustice or conduct which offends the public sense of fair play. *Id.*

 [¶ 23] Where evaluations of alleged improper comments on the right to silence have occurred before this Court, we have stated:

Prosecutorial violations are subject to the *Clenin [v. State*, 573 P.2d 844 (Wyo. 1978)] rule's mandate that failure to respect the constitutional right of the citizen-accused not to have his silence called to the jury's attention will entitle the accused to a reversal of conviction. *Westmark v. State*, 693 P.2d 220, 221–22 (Wyo.1984), *citing Clenin.* A reference to silence which is not a "comment" will not be reversed absent a showing of prejudice. *Parkhurst v. State*, 628 P.2d 1369, 1382 (Wyo.1981).

. . . .

A comment upon an accused's silence occurs when used to the state's advantage either as substantive evidence of guilt or to suggest to the jury that the silence was an admission of guilt.

*Abeyta v. State*, 2003 WY 136, ¶ 11, 78 P.3d 664, 667 (Wyo.2003). And as we said in *Spinner v. State*, 2003 WY 106, ¶ 19, 75 P.3d 1016, 1024 (Wyo.2003):

In analyzing right-to-silence cases, we consider "the entire context in which the statements were made" and we will "not take sentences and phrases out of context." [citation omitted.] We also evaluate

whether the prosecutor asked improper questions, whether he emphasized or followed up on the silence issue, and whether he attempted to exploit the issue in any way.

*Lancaster v. State*, 2002 WY 45, ¶ 39, 43 P.3d 80, 96 (Wyo.2002).

A prosecutor does not "comment" on a defendant's exercise of his right to silence where he does not attempt to use the silence to the state's advantage, where he does not argue to the jury that the silence was evidence of guilt or an admission of guilt, and where the defendant does not show any prejudice. *Shipman v. State*, 2001 WY 11 ¶ 24, 17 P.3d 34, 39 (Wyo.2001). Furthermore, material prejudice is shown only where there is a reasonable possibility that the verdict would have been more favorable to the defendant if the evidence or prosecutorial comment had not been allowed. *Emerson v. State*, 988 P.2d 518 at 522 (Wyo.1999).

[¶ 24] Here, the prosecutor's statements were made during closing, and when taken in context, certainly did not attempt to use Teniente's right to silence to the State's advantage. Neither did the prosecutor argue to the jury that the silence was evidence of Teniente's guilt, or worse, an admission of

guilt. Of course, this Court can never know what was going through the prosecutor's mind at closing; nevertheless, the statements appear to only highlight inconsistencies between witness statements and Teniente's statements given to police prior to trial. In other words, the prosecutor was pointing out what Teniente had said, not his failure to speak. We conclude that Teniente has failed to demonstrate harmful error in this instance and that no prejudice was shown such that it affected any substantial rights.

[¶ 25] Relevant to this issue is another issue of Teniente's: That the trial court erred in denying his motion for mistrial after the prosecutor commented on his right to silence. We will address that issue now.

[¶ 26] We review the denial of a mistrial motion under an abuse of discretion standard. Judicial discretion is a composite of many things, among which are conclusions drawn from objective criteria; it means a sound judgment exercised with regard to what is right under the circumstances and without doing so arbitrarily or capriciously. *Lucero v. State*, 14 P.3d 920, 924 (Wyo.2000).

[¶ 27] "Granting a mistrial is an extreme and drastic remedy that should be resorted to only in the face of an error so prejudicial that justice could not be served by proceeding with trial." *Allen v. State*, 2002 WY 48, ¶ 75, 43 P.3d 551, 575 (Wyo. 2002) (quoting *Warner v. State*, 897 P.2d 472, 474 (Wyo.1995)). In reviewing the district court's decision for an abuse of discretion, we inquire as to the reasonableness of the choice made by the trial court. *Lucero*, 14 P.3d at 924. We have recognized that the district court is in the best position to assess any prejudicial impact of this type of claimed error. *Allen*, ¶ 75, 43 P.3d at 575.

[¶ 28] In *Hughes v. State*, 658 P.2d 1294, 1296 (Wyo.1983) we held that "a fleeting reference to appellant's silence, not resulting from inquiry by the prosecution nor exploited by the prosecution, is not error." We agree with the district court's assessment. Given our previous discussion above of why the prosecutor's statements at trial were not improper, we can find no abuse of discretion in the district court's denial of Teniente's motion for a mistrial.

### c. Improper Vouching

[¶ 29] Teniente next claims that the prosecutor improperly vouched for the credibility of Jesse Magallenes, and two defense witnesses, Robert Riojas and Ruben Gutierrez, both on cross-examination and in closing argument. Furthermore, Teniente alleges that the prosecutor asserted his own personal beliefs and opinions as to the truth of testimony and guilt of Teniente during closing argument.

[¶ 30] The credibility of witnesses and the guilt of the accused are questions for the jury to resolve. *Sanchez v. State*, 2006 WY 116, ¶ 47, 142 P.3d 1134, 1146 (Wyo.2006). Counsel are allowed wide latitude during the scope of their closing arguments, and a prosecutor may comment on all of the evidence in the record and suggest reasonable inferences from that evidence. However, the prosecutor may not inflame or mislead the jury or express his personal beliefs or opinions about the evidence. *Davis v. State*, 2005 WY 93, ¶ 25, 117 P.3d 454, 463 (Wyo.2005). Similarly, a prosecutor cannot personally vouch for the credibility of a state's witness, nor can a prosecutor assert his own credibility as a basis for conviction of a defendant.

> [W]hen the prosecutor asserts his credibility or personal belief, an additional factor is injected into the case. This additional factor is that counsel may be perceived by the jury as an authority whose opinion carries greater weight than their own opinion; that members of the jury might be persuaded not by the evidence, but rather by a perception that counsel's opinions are correct because of his position as prosecutor, an important state official entrusted with enforcing the criminal laws of a sovereign state. While the prosecutor is expected to be an advocate, he may not exploit his position to induce a jury to disregard the evidence or misapply the law.

*Condra v. State*, 2004 WY 131, ¶ 11, 100 P.3d 386, 390 (Wyo.2004).

[¶ 31] While a prosecutor cannot continuously and repeatedly express his opin-

ions or beliefs as to the truth or falsity of testimony or the innocence or guilt of the defendant, he may comment on evidence and present reasonable inferences that logically flow from that evidence including making a reasonable inference that a witness is not truthful, assuming that the evidence supports such an inference. *Id.*

[¶ 32] During closing, the prosecutor said (regarding the testimony of Jesse Magallenes):

[W]e have one eyewitness, one eyewitness that stepped up to the plate February 18th, and said, 'I was there. This is what happened.' A statement as, you know, he has stayed consistent with, a statement he testified to in Eddie's trial.

As you notice, when [Defense counsel] went to question him, he couldn't impeach him on any of his prior inconsistent statements because there weren't any. He has stayed consistent, ladies and gentlemen, even in the face of threats from his family, ostracism by his family.

He saw what happened, and he decided to step forward and tell the truth, even though the first time, it's against his very own brother, and now the second time, against his cousin. Courage.

[¶ 33] Teniente claims that this is improper vouching for the credibility of Magallenes. We do not interpret the comments in the same fashion. The prosecutor was not vouching for the credibility of Magallenes. Rather, he was arguing reasonable inferences, drawn from evidence introduced at trial, that Magallenes' testimony could be seen as reliable.

[¶ 34] Teniente also claims that the prosecutor erred when he commented, "Once again, he's guilty ladies and gentlemen ..." and "Your verdict, ladies and gentlemen, is truly, guilty on both counts." However, the State is permitted to ask the jury to return a finding of guilty against a defendant unless the State implies that the jury should do so regardless of or in disregard of its duty to weigh the evidence and follow the court's

instructions. *LaFond v. State*, 2004 WY 51, ¶¶ 24–25, 89 P.3d 324, 332 (Wyo.2004). Here, there was no implication that in order for the jury to satisfy its duty, it *had* to return a guilty verdict. When taken in context, there is no impropriety in the prosecutor's comments.

[¶ 35] Finally, Teniente argues that the State "improperly criticized" defense witnesses Gutierrez and Riojas during the cross-examination of Riojas [3], and during rebuttal closing, stating, "Ruben [Gutierrez], he'll come in and say anything." Also during rebuttal, Teniente takes issue with the following comments about Riojas: "[He]'s charged, and you saw why." and "Bobby has no idea what the truth is, does he?" and "Well, if it's so easy, what happened to Bobby? The truth is the truth is the truth." Teniente claims that the prosecutor was arguing to the jury that the State did not believe Riojas was telling the truth, and that the jury should believe the State because Riojas was charged.

[¶ 36] As to the cross-examination of Riojas, a prosecutor is allowed to suggest reasonable inferences that a witness has not been truthful. *Condra*, ¶ 25; 100 P.3d at 392. Under W.R.E. 608(b), the prosecutor was well within his boundaries when he attacked Riojas' credibility. The prosecutor was suggesting to the jury that Riojas testified to a different version of events than he told law enforcement, which brought into question his inherent reliability issues.

### d. Prosecutor's Misstatement of Evidence During Closing

[¶ 37] Next, Teniente claims that the prosecutor committed misconduct when he made the following statement during rebuttal closing argument: "Bobby [Riojas]—we both forgot to ask—Do you have a felony or not? I don't know. It doesn't matter in this equation." In fact, the prosecutor had earlier asked Riojas whether or not he had a felony record, to which Riojas answered that he did not. Because defense counsel object-

---

3. During cross-examination, the prosecutor asked, "... you've been in jail since last October, haven't you?" to which Riojas replied, "Yes, sir, I have." The prosecutor then asked, "I told you what would happen if you do not tell the truth, didn't I?" to which Riojas replied, "Yes, sir."

ed, this claim is reviewed for harmless error. We conclude that any error in the comment was harmless, for several reasons.

[¶ 38] In our judgment, during closing argument, the prosecutor was offering a way of viewing the significance of the evidence heard by the jury. See *Delacruz v. State*, 10 P.3d 1131, 1133 (Wyo.2000). The inference was logical that Gutierrez's testimony was tenuous because he did not come forward in a timely fashion. It was also logical to infer that Riojas was not truthful because he admitted lying to law enforcement and to persons of authority—but insisted at trial that he was being truthful. Clearly, the prosecutor's statements were simply suggesting those reasonable inferences, staying within the bounds of acceptable argument.

### e. Introduction of Uncharged Misconduct Under W.R.E. 404(b) and Improper Impeachment

[¶ 39] Finally, Teniente's last claim of prosecutorial misconduct involves two instances of alleged impropriety: First, that the prosecutor failed to give notice to the defense before introducing uncharged misconduct evidence under W.R.E. 404(b) during his cross-examination of Robert Riojas, and second, that the prosecutor improperly impeached Riojas.[4] The State contends that the evidence was not 404(b) evidence; rather, it was admissible under 404(a)(3) and 608(b), which provide that evidence of specific instances of a witness's conduct, for purposes of attacking or supporting his credibility, may be inquired into during cross-examination of the witness, as long as the inquiry concerns his character for truthfulness or

untruthfulness.[5] Such instances, however, may not be proved by extrinsic evidence.

[¶ 40] Regarding the uncharged misconduct evidence, Riojas was questioned regarding: (1) his past use of aliases, (2) who paid for the liquor everyone drank on the night of the murder, and (3) whether or not Teniente was supposed to "cover" Riojas when he ran out of the store with alcohol the night of the murder. Given that Riojas admitted on the record that he used an alias and that he had, in the past, volunteered to violate the law on numerous occasions, in fact, does show his credibility, or lack thereof. Under this limited situation, and given the narrow scope of the prosecutor's inquiry, no error was present.

[¶ 41] We next turn to Teniente's claim that the prosecutor allegedly improperly impeached Riojas in several instances. The first challenged occurrence of impeachment took place when the State reviewed with Riojas his first interview with law enforcement and his statements about why he came to Cheyenne on the night of the murder.

Q: Detective starts out, "Let's start off, Bobby, what happened down in Greeley?" and you said, "I was drinking having a good time. They wanted—Eddie wanted some dope so we came to Cheyenne, couldn't buy any dope down in Greeley"; is that true?

A: Huh?

Q: No dope to be had down in Greeley?

A: No, sir.

Q: They don't sell that down there?

---

4. Teniente filed a pre-trial demand for notice of intent to use 404(b) evidence at trial. Accordingly, he was not required to object during trial to the challenged evidence. *Howard v. State*, 2002 WY 40, ¶ 23, 42 P.3d 483, 491 (Wyo.2002). Thus, the claims of prosecutorial misconduct under this subsection are reviewed under the harmless error standard. *Butcher v. State*, 2005 WY 146, ¶ 38, 123 P.3d 543, 554 (Wyo.2005).

5. W.R.E. 404(a)(3) states:
(a) *Character evidence generally.*—Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:

(1) Character of Accused.—Evidence of a pertinent trait of his character offered by an accused, or by the prosecution to rebut the same;
(2) Character of Victim.—Evidence of a pertinent trait of character of the victim of the crime offered by an accused, or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor;
(3) Character of Witness.—Evidence of the character of a witness, as provided in Rules 607, 608, and 609.

A: I don't know anybody that does.

Q: Now, nobody came up to Cheyenne and got any dope, did they?

A: No, sir.

[¶ 42] Teniente complains that this inquiry violated an *Order in Limine* by the court where the judge ruled, "The State will offer no evidence from any witness that the defendant possessed, nor in any way was associated with, controlled substances on the night in question with the exception of the defendant's statement, which the State contends is false, that the purpose of the trip to Cheyenne was to get ice,[6] that the victim left out the back door to get it and wasn't seen."

[¶ 43] Also relevant to our discussion is the following exchange which occurred between counsel on the record:

Defense Counsel: So you're not going to present any witness that's going to come in here and say, on the night in question, they saw methamphetamine or ice in the possession of my client?

Prosecutor: No. The only drugs we know to have been possessed—the only ice—methamphetamine is Eddie.

[¶ 44] It is true that when an order on a motion in limine excludes evidence, W.R.E. 103(a) requires no further action to preserve the issue. *Robinson v. State*, 11 P.3d 361, 369 (Wyo.2000). Here, however, the testimony at issue is clearly not covered by the *Order in Limine*, nor the on-the-record discussion between counsel. As such, because no objection was lodged to the complained of testimony, Teniente has the burden of proving plain error, which requires that the record show the incident alleged as error, and that a clear and unequivocal rule of law was violated. The first element is satisfied, but Teniente still has the burden of proving that a clear rule of law was violated that materially prejudiced his right to a fair trial.

[¶ 45] The testimony at issue references Eddie Magallenes', not Teniente's, desire to obtain "dope." Additionally, the testimony confirms that no one, including Teniente, obtained any "dope" on the night in question. Rather, the line of questioning seems to show the contradictions between Riojas' state-

ments to law enforcement, his statements on direct examination, and his statements during cross-examination. In short, no rule of law was violated materially prejudicing Teniente's right to a fair trial.

■ [¶ 46] Next, Teniente contends that the prosecutor improperly inquired into matters falling within the attorney-client privilege between Riojas and his attorney. The following exchange occurred:

Q: So you got him back in the car, and I continue on, 'So Chowie's driving?'

And you go, "yeah."

I said, "So you guys come up South Greeley Highway, come up over the viaduct?"

And you say, "No, East Lincolnway."

And I go, "Okay."

And you go, "Right over the viaduct just right there, we dropped him off."

And I say, "Which would be right where the Hardee's is as you come over the viaduct?"

And you say, "Just right by that light, you know. There's a viaduct right there. There's a light thing going towards that Hobby Lobby right there. There's a Kum & Go right there, and a Mini–Mart and a Kum & Go on the corner."

Remember all that?

A: Um-hum.

Q: Now, do you remember the conversation that happened then?

A: No.

Q: Go to the next page. So I ask you the question at the top of the page, "So you guys came up on South Greeley from Greeley?"

A: What page are you on?

Q: Seven. Then you say, "No, no, no, no. We was on the interstate."

And your attorney, who's sitting there with you, says, "They were on the interstate."

Now, your attorney sat through this whole interview with you, didn't she?

A: Yes.

---

6. "Ice" apparently is a euphemism for metham- phetamine.

Q: Had you told her the truth of what actually happened before you sat down in this interview?

A: No.

Q: So she didn't know you were lying to her all the time?

A: (Witness shook head).

[¶ 47] We review this exchange for plain error, as no objection appears on the record. Indeed, the decision whether to waive the attorney-client privilege belongs solely to the client. *Bennett v. State*, 794 P.2d 879, 883 (Wyo.1990). In this circumstance, however, it does not appear that any privilege was invoked, or waived. The State was not inquiring into what Riojas actually told his lawyer, or even what the truth actually was. Instead, Riojas was asked if he had, at that point, told his lawyer the real story. This question obviously went again to Riojas' credibility.[7]

[¶ 48] Lastly, Teniente contends that the State used improper hearsay testimony to impeach Riojas. Riojas testified on direct that he, in fact, lied to Detective Gesell but that he did so of his own accord. During cross-examination, however, Riojas testified that he lied to the detective because his mother told him to do so. The following line of questioning ensued:

Q: Mr. Riojas, you testified in the Eddie Magallenes trial, didn't you?

A: Yes, sir.

Q: You took an oath in that case and swore to tell the truth?

A: Yes, sir.

Q: And you told the truth then?

A: Yes, sir.

Q: Your testimony in that last trial was the truth also?

A: Yes, sir.

Q: Now, you testified yesterday that you lied to the detective here because your mother told you to, remember that?

A: Yes, sir.

Q: Now, your mom testified in the Eddie Magallenes trial, too, didn't she?

A: Yes, sir.

Q: Sat on that very witness stand where you are, didn't she?

A: Yes, sir.

Q: She, in fact, testified under oath that you're a liar, didn't she?

A: Yes, sir.

[¶ 49] Prior to trial, the defense filed a *Motion in Limine* asking the court to prohibit hearsay evidence. However, the court never specifically ruled on the admission of such evidence stating, "[s]ome of these things [specific instances of hearsay] just have to be handled when they arise. I'm sure you'll make the appropriate objections at the time." Defense counsel did not object and once again, because no objection appears on the record, we review this exchange for plain error.

[¶ 50] In brief, what occurred here was not hearsay. Under our rules of evidence, the reputation of a person's character among his associates or in the community is an exception to the hearsay rule. W.R.E. 803(21). Furthermore, the credibility of a witness may be attacked or supported by evidence in the form of an opinion or reputation as to the witness's character for truthfulness or untruthfulness. W.R.E. 608(a). That the witness whose credibility was at issue conceded as to his less-than-perfect reputation was a boon for the State.

[¶ 51] In arguing this issue, Teniente suggests to this Court a line of cases wherein we have condemned a prosecutor using "lying" lines of questioning to undermine a witness's credibility. See *Jensen v. State*, 2005 WY 85, ¶¶ 18–22, 116 P.3d 1088, 1094–97 (Wyo.2005) ("There is a limit to the cross-examination of a criminal defendant: nonetheless, it is likewise error and misconduct for the prosecutor to cross-examine a defendant using the "lying" or "mistaken" technique (i.e., well, then

---

7. Teniente also tangentially claims that because Mr. Riojas, perhaps as recently as the morning of his testimony, had become represented by counsel, the State may have violated Rule 4.2 of the Wyoming Rules of Professional Conduct, which disallows an attorney to communicate with a party who is represented by another lawyer in the matter, without consent. However, Riojas was called by the defense, and, accordingly, was subject to cross-examination by the State. This was not objected to specifically at trial, thus we decline to further address the matter on appeal.

if "so-and-so" said "such-and-such," was he "mistaken" or "lying?"). Such questions are improper."). See also *Beaugureau v. State,* 2002 WY 160, ¶¶ 14–17, 56 P.3d 626, 632–36 (Wyo.2002). Certainly, courts prohibit "were-they-lying" questions for several reasons: 1) They invade the province of the jury, as determinations of credibility are for the jury, 2) they are argumentative and have no probative value, 3) they create a risk that the jury may conclude that, in order to acquit the defendant, it must find that a contradictory witness has lied, 4) they are inherently unfair, as it is possible that neither the defendant nor the contradictory witness has deliberately misrepresented the truth, and 5) they create a "no-win" situation for the defendant. If the defendant states that a contradictory witness is not lying, the inference is that the defendant is lying, whereas if the defendant states that the witness is lying, the defendant risks alienating the jury.

[¶ 52] Teniente's comparison of the "were-they-lying" cases to his circumstances is misplaced. Rather than a line of questioning designed to inquire whether or not a witness was being truthful, the prosecutor here simply asked Riojas whether or not his mother previously testified that *he* was a liar. The prosecutor was not implying that she was unreliable—he was simply trying to show that it was the reputation of Riojas that preceded him.

### Issue III—*Admission of Gang Related Evidence*

[¶ 53] In Teniente's third argument, he asserts that the trial court erroneously admitted "irrelevant information of alleged gang activity." The State disagrees and argues that the testimony was properly admitted because it showed witness bias and lack of credibility.

▮ [¶ 54] The standard of review for this issue is abuse of discretion:

'Evidentiary rulings are within the sound discretion of the trial court and include determinations of the adequacy of foundation and relevancy, competency, materiality, and remoteness of the evidence. This Court will generally accede to the trial court's determination of the admissibility of evidence unless that court clearly abused its discretion.' *Solis v. State,* 981 P.2d 34, 36 (Wyo.1999) (citation omitted). We have described the standard of an abuse of discretion as reaching the question of the reasonableness of the trial court's choice. Judicial discretion is a composite of many things, among which are conclusions drawn from objective criteria; it means exercising sound judgment with regard to what is right under the circumstances and without doing so arbitrarily or capriciously. 'In the absence of an abuse of discretion, we will not disturb the trial court's determination.' [*Griswold v. State,* 2001 WY 14, ¶ 7, 17 P.3d 728, 731 (Wyo.2001).] The burden is on the defendant to establish such abuse.

*Wilks v. State,* 2002 WY 100, ¶ 19, 49 P.3d 975, 984–85 (Wyo.2002) (quoting *Skinner v. State,* 2001 WY 102, ¶ 25, 33 P.3d 758, 766 (Wyo.2001), *cert. denied,* 535 U.S. 994, 122 S.Ct. 1554, 152 L.Ed.2d 477 (2002)); see also, *Gabbert v. State,* 2006 WY 108, ¶ 24, 141 P.3d 690, 697 (Wyo.2006); *Brown v. State,* 2005 WY 37, ¶ 12, 109 P.3d 52, 56 (Wyo.2005).

[¶ 55] In order to determine the propriety of the testimony elicited, we must consider what equals "relevant" evidence. According to the Wyoming Rules of Evidence, relevant evidence is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. W.R.E. 401. Furthermore, relevant evidence may be excluded if its probative value is substantially outweighed by its prejudicial effect. W.R.E. 403. This rule, however, does not allow the exclusion of evidence simply because it is prejudicial—the evidence must be unfairly prejudicial before its prejudicial effect is weighed against its probative value. *Robinson v. State,* 716 P.2d 364, 367 (Wyo.1986).

[¶ 56] In *James v. State,* 998 P.2d 389 (Wyo.2000), this Court held that where a sufficient foundation established the common gang membership of the defendant and a witness, evidence of that gang membership was relevant to show witness bias. In

*James,* we agreed with the defendant that journal entries read aloud to the jury "containing numerous racial slurs, referring to James' own bragging that he was a gang member, telling of James' penchant for making gang signs, and describing him as thuggish and controlling" were irrelevant to prove or disprove any elements of the charged crimes. *Id.,* 998 P.2d at 394.

[¶ 57] No journal entries were read aloud to the jury in the instant case; however, extensive witness questioning about tattoos and their meanings, the terms "homies" and "buddies," and the gang term "jumping in" occurred. We do not excerpt the testimony here, but our thorough review of the record reflects that the prosecutor simply was trying to establish the witness' bias toward Teniente and, thus, his lack of credibility as a witness.

[¶ 58] First, the prosecutor questioned the witness regarding his tattoos. Even as defense counsel objected, the prosecutor explained that the tattoo line of questioning was in an effort to "[show] his affiliation with the LP gang to which [sic] he is a member to which [sic] Mr. Teniente's a member." The following day, the prosecutor continued his line of questioning, this time talking about how to become a member of the gang and what "jumping in" means.[8] The "loyalty" theme repeatedly occurs during the prosecutor's questioning and the evidence being sought as part of that theme, through questions about tattoos and gang activity, was indeed relevant.

[¶ 59] According to our review of the record, the prosecutor's line of questioning was not, contrary to Teniente's assertion, unlimited or unfettered, gratuitous, or lurid. Simply put, the testimony reflects the prosecutor's effort to discredit the witness. Accordingly, we hold that there was no abuse of discretion in admitting relevant testimony that had probative value.

Issue IV—*Hearsay*

[¶ 60] In his fourth issue, Teniente argues that the prosecutor elicited hearsay testimony from two witnesses, and that he was thus denied his right to due process and a fair trial. Furthermore, Teniente asserts that his trial counsel was ineffective for failing to object to the same.

[¶ 61] Specifically, Teniente claims that the prosecutor at trial "overtly led hearsay from Jesse [Magallenes] to the effect that Mr. Teniente had threatened to shoot the victim, that Mr. Teniente directed Jesse to drive to the scene of the shooting, that Mr. Teniente (not Jesse) handed the shooter a gun, that Mr. Teniente (not Jesse) instructed Eddie to shoot the victim twice and that Mr. Teniente afterwards told him, and others in the car, 'be quiet. Don't say nothing.'" Teniente also claims that Detective Linda Gesell also improperly testified about hearsay.

[¶ 62] We review instances objected to under an abuse of discretion standard, determining whether or not the trial court abused its discretion by allowing the objected to testimony. *Wilks v. State,* 2002 WY 100, ¶ 19, 49 P.3d 975, 984 (Wyo.2002). When there is no objection, we utilize the plain error standard of review. *Hernandez v. State,* 2007 WY 105, ¶ 10, 162 P.3d 472, 476 (Wyo.2007).

[¶ 63] We first look to the testimony of Detective Gesell. Defense counsel objected to Detective Gesell's testimony, but lodged objections as to vouching and redundancy—not hearsay. Therefore, regarding the testimony of Detective Gesell, Teniente must show: 1) the claimed error clearly appears in the record; 2) the error violated a clear and unequivocal rule of law in an obvious way; and 3) he was deprived of a substantial right resulting in material prejudice. *Hernandez,* ¶ 10, 162 P.3d at 476.

[¶ 64] Element one is satisfied because the detective's testimony clearly appears in the record. Whether the testimony violated a clear and unequivocal rule of law in an obvious way is our next concern. As we recently stated in *Martin v. State,* 2007 WY 76, ¶ 24, 157 P.3d 923, 929 (Wyo.2007):

---

8. "Jumping in" apparently is a gang term that means a group of males attack one male, proving the loyalty of the one being attacked. After the attack, the male who was attacked becomes a member of the gang.

Pursuant to Rule 802 of the Wyoming Rules of Evidence, hearsay is inadmissible "except as provided by these rules or by other rules adopted by the Supreme Court of Wyoming or by statute." *Wilde v. State*, 2003 WY 93, ¶ 11, 74 P.3d 699, 706 (Wyo.2003); *O'Brien v. State*, 2002 WY 63, ¶ 28, 45 P.3d 225, 234 (Wyo.2002); W.R.E. 802. Hearsay, as defined by W.R.E. 801(c): "is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." *O'Brien*, ¶ 28, 45 P.3d at 234.

[¶ 65] After reviewing the detective's testimony in full, we are confident that the portions alleged to be hearsay are indeed not hearsay, because the statements were not offered to prove the truth of the matter asserted. Instead, the detective's testimony showed a history of inconsistency by Bobby Riojas' statements, depicting him as unreliable and uncredible. Moreover, the testimony was prefaced by this exchange:

Prosecutor: Detective, you sit in a unique position being the one person that's interviewed Bobby Riojas twice on tape before and sat through both of his testimonies?

A: Correct.

Prosecutor: You're familiar with all four?

A: Yes.

Prosecutor: Ever tell the same story twice?

A: No.

It is apparent to this Court that a clear rule of law was not violated by the detective's testimony, eradicating any notion of plain error having occurred in this instance.

[¶ 66] We next consider the testimony of Jesse Magallenes, which we review in part for plain error and in part for abuse of discretion. We address first the testimony that warrants plain error review. Teniente suggests that Magallenes' testimony contained hearsay when he related that the victim said, "You should have done something to me or you should have hurt me because my family's not going to let that go." Magallenes further testified that Teniente "jumped over, turned around, and pulled the gun, put it in his face, and said, 'Shut your

f——ing mouth, or I'll shoot you.'" Magallenes also testified that Teniente told him to drive to Campstool Road and then stop, to shoot the victim, to drive back home, and to "be quiet" and "don't say nothing." This testimony is clearly reflected in the record. However, when taken in context, and after reading Magallenes' testimony as a whole, it is apparent that rather than the statements being offered for the truth of the matter asserted, they illustrated, as the State suggests, the chain of events that resulted in the victim's death.

[¶ 67] Not only were the statements not offered for the truth of the matter asserted, they were exceptions to the hearsay rule as admissions by a party-opponent offered to prove what happened on the night in question. W.R.E. 801(d)(2)(A).

[¶ 68] Finally, Teniente contends that Magallenes gave hearsay testimony when he testified that Bobby Riojas called him the day after Lopez's murder, told him that the police had just been at Teniente's and Riojas' residences, and instructed Magallenes to tell the police a fabricated story about the night before. Because defense counsel objected on the grounds of hearsay, we must determine if the trial court abused its discretion by allowing the testimony.

[¶ 69] Again, hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. While no explanation was offered to the objection being overruled at trial as to what exception applied, there are twenty-three exceptions to the hearsay rule. In its brief, the State suggests two possibilities for this Court to consider, which are set forth in W.R.E. 803(2) and 803(3): "excited utterances" and "then existing mental, emotional, and physical conditions," respectively.

[¶ 70] The exception for a then-existing mental, emotional, or physical condition, found in W.R.E. 803(3), reads:

*Then-existing mental, emotional, or physical condition.*—A statement of the declarant's then-existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling,

pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will[.]

[¶ 71] Our review of the record shows that the challenged statement qualified as a statement of Magallenes' then-existing state of mind pursuant to W.R.E. 803(3). It was a statement of what the witness perceived at the time. The statement was not hearsay, offered for the truth of the matter asserted, and the trial court accordingly did not abuse its discretion in admitting the statement.

[¶ 72] Before we leave this particular issue, we feel it necessary to address a portion of Teniente's argument that the specific error in allowing this testimony was that it "inferred but did not competently prove the accused's guilt." Similar to *Cowell v. State*, 719 P.2d 211, 214 (Wyo.1986), Teniente contends that the jury was able to find him guilty in part due to a chain of inferences from the so-called hearsay testimony above. As we stated in *Cowell*,

> Introductory to a discussion of inferences in *Downs v. State*, [581 P.2d 610 (Wyo. 1978)], the court said:
>
> > "The defendant urges essentially that guilt cannot be based solely on circumstantial evidence because it means piling up inferences. We know of no such concept representing accepted jurisprudence with respect to circumstantial evidence. Circumstantial evidence is many times the only way that an ultimate fact may be shown. *Blakely v. State*, Wyo. 1975, 542 P.2d 857, explains that circumstantial evidence has standing and stature and is to be measured upon the same basis as direct evidence. It is a chain of proven circumstances indicating the guilt or innocence of the defendant. "We see no proving of an inference from another inference in this case. There may be something offensive about basing an inference on an inference. It is an extremely technical as well as much criticized theory, Annotation, 5 A.L.R.3d 100, entitled, 'Modern status of the rules against basing an inference upon an inference or a presumption upon a pre-

sumption,' and has been noted in the jurisprudence of Wyoming but found inapplicable or of at least questionable application in those cases where mentioned. *Richey v. State*, 1921, 28 Wyo. 117, 201 P. 154, reh. denied, 28 Wyo. 117, 205 P. 304; *Rosencrance v. State*, 1925, 33 Wyo. 360, 239 P. 952. Be that as it may, we cannot see its applicability to this case, even if an accepted rule. In the case before us now, the circumstantial facts presented through direct evidence point to only one ultimate inferential fact—guilt. That is distinctively different from pyramiding inferences." 581 P.2d at 614–615.

*Cowell*, 719 P.2d at 215–16. Sequentially, the "chain of proven circumstances" referred to in *Cowell* is also present here as a reasonable course of times and events, including the men being together in Greeley and Cheyenne on the night in question, all of them traveling around each town, and from Greeley to Cheyenne in the same vehicle, the corroborative testimony by family members and friends of the men's whereabouts that night, and the timing of it all. The testimony regarding the series of events that night and the ensuing days satisfies us that the jury could reasonably find Teniente guilty without basing that conclusion on inference upon inference. Sufficient evidence for conviction clearly existed, enough so that the jury was convinced beyond a reasonable doubt.

[¶ 73] And, finally, we address the ineffective assistance of counsel issue. Teniente contends that ineffective assistance of counsel occurred to the extent that trial counsel failed to object to inadmissible hearsay.

[¶ 74] We review claims of ineffective assistance of counsel under the following standard:

> When reviewing a claim of ineffective assistance of counsel, the paramount determination is whether, in light of all the circumstances, trial counsel's acts or omissions were outside the wide range of professionally competent assistance. *Herdt v. State*, 891 P.2d 793, 796 (Wyo.1995); *Starr v. State*, 888 P.2d 1262, 1266–67 (Wyo. 1995); *Arner v. State*, 872 P.2d 100, 104

(Wyo.1994); *Frias v. State*, 722 P.2d 135, 145 (Wyo.1986). The reviewing court should indulge a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Herdt*, at 796; *Starr*, at 1266; *Arner*, at 104; *Strickland v. Washington*, 466 U.S. 668, 689, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984).

Under the two-prong standard articulated in *Strickland* and *Frias*, an appellant claiming ineffective assistance of counsel must demonstrate on the record that counsel's performance was deficient and that prejudice resulted. *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064; *Starr*, 888 P.2d at 1266; *King v. State*, 810 P.2d 119, 125 (Wyo.1991) (Cardine, J., dissenting); *Campbell v. State*, 728 P.2d 628, 629 (Wyo. 1986); *Frias*, 722 P.2d at 145. In other words, to warrant reversal on a claim of ineffective assistance of counsel, an appellant must demonstrate that his counsel failed to "render such assistance as would have been offered by a reasonably competent attorney" and that "counsel's deficiency prejudiced the defense of the case." *Lower v. State*, 786 P.2d 346, 349 (Wyo. 1990). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686, 104 S.Ct. at 2064.

*Duke v. State*, 2004 WY 120, ¶ 36, 99 P.3d 928, 943 (Wyo.2004), *cert. denied*, 544 U.S. 1062, 125 S.Ct. 2513, 161 L.Ed.2d 1113 (2005). The burden of proving that counsel was ineffective rests entirely on an appellant. *Id.* (citing *Asch v. State*, 2003 WY 18, ¶ 11, 62 P.3d 945, 949–50 (Wyo.2003); *Barkell v. State*, 2002 WY 153, ¶ 10, 55 P.3d 1239, 1242 (Wyo.2002)). "To satisfy his burden, an appellant must provide more than mere speculation or equivocal inferences." *Id.* (citing *Sincock v. State*, 2003 WY 115, ¶ 37, 76 P.3d 323, 337 (Wyo.2003); *Barkell*, ¶ 13, 55 P.3d at 1243).

[¶ 75] Teniente faults trial counsel for not objecting to the alleged instances of hearsay discussed above. We reject Teniente's claim because he has failed to provide any legal analysis supporting his ineffectiveness claim. We have consistently stated that we will not consider claims devoid of cogent argument and citation to legal authority. *Duke*, ¶ 49, 99 P.3d at 946; *Eustice v. State*, 11 P.3d 897, 904 (Wyo.2000); *Blumhagen v. State*, 11 P.3d 889, 897 n. 2 (Wyo.2000). We apply that rule in this instance.

*Issue V—Right to Confront Witnesses*

[¶ 76] Teniente next argues that his right to confront witnesses was compromised by the elicitation of testimonial hearsay. Specifically, Teniente argues that pursuant to *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the admission of testimonial hearsay from Jesse Magallenes and Detective Gesell violated his Sixth Amendment right to confront witnesses against him.

[¶ 77] The first issue for our determination is whether the introduction of the hearsay statements at issue was error. *Vigil v. State*, 2004 WY 110, ¶ 18, 98 P.3d 172, 178 (Wyo.2004). In *Vigil*, we discussed at length the concepts introduced, and clarified, in *Crawford*.

The introduction of any testimonial hearsay evidence violates the Confrontation Clause unless the declarant is legally unavailable and the defendant has had a prior opportunity to cross-examine the declarant:

[T]he Framers would not have allowed admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination. The text of the Sixth Amendment does not suggest any open-ended exceptions from the confrontation requirement to be developed by the courts.

*Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 1365, 158 L.Ed.2d 177 (2004). The *Crawford* Court specifically overruled prior precedent that allowed hearsay statements of an unavailable declarant to come into evidence if it fit within a "firmly rooted hearsay exception" or bears "particular-

ized guarantees of trustworthiness" as initially developed in *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980):

> The legacy of *Roberts* in other courts vindicates the Framers' wisdom in rejecting a general reliability exception. The framework is so unpredictable that it fails to provide meaningful protection from even core confrontation violations.

> Reliability is an amorphous, if not entirely subjective, concept. There are countless factors bearing on whether a statement is reliable; the nine-factor balancing test applied by the Court of Appeals below is representative. See, *e. g., People v. Farrell,* 34 P.3d 401, 406–407 (Colo.2001) (eight-factor test). Whether a statement is deemed reliable depends heavily on which factors the judge considers and how much weight he accords each of them. Some courts wind up attaching the same significance to opposite facts. For example, the Colorado Supreme Court held a statement more reliable because its inculpation of the defendant was "detailed," *Id.,* at 407, while the Fourth Circuit found a statement more reliable because the portion implicating another was "fleeting," *United States v. Photogrammetric Data Servs., Inc.,* 259 F.3d 229, 245 (C.A.4 2001). The Virginia Court of Appeals found a statement more reliable because the witness was in custody and charged with a crime (thus making the statement more obviously against her penal interest), see *Nowlin v. Commonwealth,* 40 Va.App. 327, 335–338, 579 S.E.2d 367, 371–372 (2003), while the Wisconsin Court of Appeals found a statement more reliable because the witness was *not* in custody and *not* a suspect, see *State v. Bintz,* 2002 WI App 204, ¶ 13, 257 Wis.2d 177, 187, 650 N.W.2d 913, 918. Finally, the Colorado Supreme Court in one case found a statement more reliable because it was given "immediately after" the events at issue, *Farrell, supra,* at 407, while that same court, in another case, found a statement more reliable because two years had elapsed, *Stevens v. People,* 29 P.3d 305, 316 (Colo.2001).

> The unpardonable vice of the *Roberts* test, however, is not its unpredictability, but its demonstrated capacity to admit core testimonial statements that the Confrontation Clause plainly meant to exclude. Despite the plurality's speculation in *Lilly,* 527 U.S. at 137, 119 S.Ct. 1887, 144 L.Ed.2d 117, that it was "highly unlikely" that accomplice confessions implicating the accused could survive *Roberts,* courts continue routinely to admit them. See *Photogrammetric Data Servs., supra,* at 245–246; *Farrell, supra,* at 406–408; *Stevens, supra,* at 314–318; *Taylor v. Commonwealth,* 63 S.W.3d 151, 166–168 (Ky.2001); *State v. Hawkins,* No.2001–P–0060, 2002 WL 31895118, ¶¶ 34–37, (Ohio App., Dec. 31, 2002); *Bintz, supra,* 7–14, 257 Wis.2d, at 183–188, 650 N.W.2d, at 916–918; *People v. Lawrence,* 55 P.3d 155, 160–161 (Colo.App.2001); *State v. Jones,* 171 Or. App. 375, 387–391, 15 P.3d 616, 623–625 (2000); *State v. Marshall,* 136 Ohio App.3d 742, 747–748, 737 N.E.2d 1005, 1009 (2000); *People v. Schutte,* 240 Mich.App. 713, 718–721, 613 N.W.2d 370, 376–377 (2000); *People v. Thomas,* 313 Ill.App.3d 998, 1005–1007, 246 Ill.Dec. 593, 730 N.E.2d 618, 625–626 (2000); cf. *Nowlin, supra,* at 335–338, 579 S.E.2d, at 371–372 (witness confessed to a related crime); *People v. Campbell,* 309 Ill.App.3d 423, 431–432, 242 Ill.Dec. 694, 699, 721 N.E.2d 1225, 1230, (1999) (same). One recent study found that, after *Lilly,* appellate courts admitted accomplice statements to the authorities in 25 out of 70 cases-more than one-third of the time. Kirst, Appellate Court Answers to the Confrontation Questions in *Lilly v. Virginia,* 53 Syracuse L.Rev. 87, 105 (2003). Courts have invoked *Roberts* to admit other sorts of plainly testimonial statements despite the absence of any opportunity to cross-examine. See *United States v. Aguilar,* 295 F.3d 1018, 1021–1023 (C.A.9 2002) (plea allocution showing existence of a conspiracy); *United States v. Centracchio,* 265 F.3d 518, 527–530 (C.A.7 2001) (same); *United States v. Dolah,* 245 F.3d 98, 104–105 (C.A.2 2001) (same); *United States v. Petrillo,* 237 F.3d 119, 122–123 (C.A.2 2000) (same); *United States v. Moskowitz,* 215 F.3d 265, 268–269 (C.A.2 2000) (same); *United States v. Gallego,* 191 F.3d 156,

166–168 (C.A.2 1999) (same); *United States v. Papajohn,* 212 F.3d 1112, 1118–1120 (C.A.8 2000) (grand jury testimony); *United States v. Thomas,* 30 Fed.Appx. 277, 279 (C.A.4 2002) (same); *Bintz, supra,* 15–22, 257 Wis.2d, at 188–191, 650 N.W.2d, at 918–920 (prior trial testimony); *State v. McNeill,* 140 N.C.App. 450, 457–460, 537 S.E.2d 518, 523–524 (2000) (same).

To add insult to injury, some of the courts that admit untested testimonial statements find reliability in the very factors that *make* the statements testimonial. As noted earlier, one court relied on the fact that the witness's statement was made to police while in custody on pending charges—the theory being that this made the statement more clearly against penal interest and thus more reliable. *Nowlin, supra,* at 335–338, 579 S.E.2d, at 371–372. Other courts routinely rely on the fact that a prior statement is given under oath in judicial proceedings. *E.g., Gallego, supra,* at 168 (plea allocution); *Papajohn, supra,* at 1120 (grand jury testimony). That inculpating statements are given in a testimonial setting is not an antidote to the confrontation problem, but rather the trigger that makes the Clause's demands most urgent. It is not enough to point out that most of the usual safeguards of the adversary process attend the statement, when the single safeguard missing is the one the Confrontation Clause demands.

*Crawford,* 124 S.Ct. at 1371–72. The *Crawford* Court concluded that "[w]here testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." *Id.* at 1374.[3]

■ [¶ 78] Regarding Jesse Magallenes, he testified that as he walked into the jail before Eddie Magallenes' trial, Eddie yelled, "Keep your mouth shut." Defense counsel objected on the grounds that the testimony violated *Crawford.* The court overruled the objection, stating that the testimony was not offered for the truth of the matter asserted. Instead, the testimony was offered to perhaps show that Jesse was scared. The state-

ments at issue do not fall within the categories of testimonial evidence described in *Crawford*—that the statements were within earshot of law enforcement does not allow them to rise to the level of "testimonial" as described in *Crawford.*

■ [¶ 79] Regarding the statements made by Detective Gesell, we also conclude that they do not present a problem under *Crawford.* Rather, *Crawford* specifically states that when a declarant appears for cross-examination at trial, the Confrontation Clause places no constraints whatsoever on the use of prior testimonial statements. *Crawford,* 541 U.S. at 59, 124 S.Ct. 1354. As the State points out, Riojas was the actual declarant, and not only was he cross-examined regarding his inconsistent testimony and previous statements, he testified on Teniente's behalf.

[¶ 80] Finally, we summarily dismiss Teniente's one-sentence claim that trial counsel was ineffective for not lodging a *Crawford* objection to Detective Gesell's testimony. Because this argument is not supported with legal argument or citation to pertinent authority, we will not address it here.

*Issue VI—Motion for Mistrial* [9]

*Issue VII—Wyo. Stat. Ann. § 6–2–101(c) is Unconstitutionally Vague*

[¶ 81] Teniente argues that Wyo. Stat. Ann. § 6–2–101(c) is unconstitutionally vague on its face, first because its lack of guidelines for imposing a sentence of life without parole renders such a sentence arbitrary. Second, Teniente contends that the statute is unconstitutionally vague as applied to his case because he did not know what evidence the trial court would consider in sentencing him, and as a result, his counsel was deprived of any meaningful opportunity to argue for a lesser sentence. Lastly, Teniente argues that his sentence is an enhanced punishment, vis-à-vis a normal life sentence, which due process requires to be based on findings by a jury rather than a judge.

[¶ 82] The State disagrees, and argues that the statute is not unconstitutionally

---

**9.** This issue is addressed within Issue II above, ¶¶ 27–30.

vague, and that district courts have broad discretion to determine the appropriate length of imprisonment, so long as it is within the legislatively mandated minimum and maximum sentence, which was the case with the sentence here. Furthermore, the State contends that the court sentenced Teniente based upon reliable and accurate information to which Teniente had the opportunity to respond.

[¶ 83] We review constitutional challenges *de novo*. *Rabuck v. State*, 2006 WY 25, ¶ 13, 129 P.3d 861, 864 (Wyo.2006). We begin our review with the presumption that the statute is constitutional. *Carfield v. State*, 649 P.2d 865, 870 (Wyo.1982). Teniente bears the heavy burden of proving his contention, with all reasonable doubt resolved in favor of the statute's constitutionality. *Id.*

[¶ 84] Teniente challenges § 6–2–101(c), claiming that it is unconstitutionally vague both on its face and as applied. At the outset, we note that our legislature may not promulgate vague or uncertain statutes under the constitutions of Wyoming and the United States. *Rabuck*, ¶ 14, 129 P.3d at 864.

> A statute violates due process under the Fifth and Fourteenth Amendments of the United States Constitution on vagueness grounds and is void if it fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by statute, and violates equal protection if it encourages arbitrary and erratic arrests and convictions.

*Moe v. State*, 2005 WY 58, ¶ 9, 110 P.3d 1206, 1210 (Wyo.2005) (internal citations omitted).

[¶ 85] As we begin our analysis, we would be remiss to not refer to our prior opinion on this exact issue in *Kenyon v. State*, 2004 WY 100, ¶ 13, 96 P.3d 1016, 1022 (Wyo.2004). In *Kenyon*, we concluded that:

> The statutory penalty of life without parole is one of three punishments for which no further factfinding is required once a jury has determined that the crime of first degree murder has been proved.

Furthermore, we stated, "[b]ecause the statute does not require the finding of additional facts independent of those proving the under-

lying offense, the constitutional concerns addressed in *Apprendi [v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000)] are not implicated." *Id.* ¶ 13, 96 P.3d at 1022.

[¶ 86] With these principles in mind, we first address Teniente's facial challenge:

> "[A] facial challenge is available in only two situations: (1) when the statute reaches a substantial amount of constitutionally protected conduct, and (2) when the statute is shown to specify no standard of conduct at all." *Moe*, ¶ 9, 110 P.3d at 1210.

> To succeed on a facial vagueness challenge to a legislative measure that does not threaten constitutionally protected conduct … a party must do more than identify some instances in which the application of the statute may be uncertain or ambiguous; he must demonstrate that the law is impermissibly vague *in all of its applications*.

> *Alcalde v. State*, 2003 WY 99, ¶ 15, 74 P.3d 1253, 1260–61 (Wyo.2003) (emphasis in original) (internal quotation marks omitted).

*Harris v. State*, 2006 WY 76, ¶ 17, 137 P.3d 124, 130 (Wyo.2006). Furthermore, successful challenges to statutes for facial vagueness are rare. *Griego v. State*, 761 P.2d 973, 975 (Wyo.1988). Courts do not ordinarily permit a party whose particular conduct is adequately described by a criminal statute to challenge the statute on the grounds it does not provide adequate warning concerning other conduct that might fall within its ambit. *Id.* It is only where a statute reaches a substantial amount of constitutionally protected conduct or specifies no standard of conduct at all that such challenges will be considered. *Id.*

[¶ 87] Teniente contends that the statute at issue reaches constitutionally protected conduct, and that it does not specify any standard of conduct—in other words, § 6–2–101(c) does not articulate a "minimum" and "maximum" sentence and, ultimately, sentencing under the statute results in an enhancement. He asserts that the sentences of life and life without parole are sentencing alternatives, for which no guidance is provid-

ed to the sentencing court, other than the vague language that' the court should take into account "any negotiated plea agreement and any evidence relevant to a determination of sentence which the court deems to have probative value." § 6–2–101(c). Teniente is also concerned that he serves his sentence with "no idea" of what the court considers evidence which made his sentence of life without parole appropriate to him. We addressed this very argument in *Kenyon*, ¶ 13, 96 P.3d at 1022.

[¶ 88] Teniente rebuts our reasoning in *Kenyon* with his belief that the lack of additional fact-finding by the jury is in large part the problem. Furthermore, he suggests that the restrictions on the procedures to be used and the issues to be considered in imposing the death penalty, as set forth in Wyo. Stat. Ann. § 6–2–102 (LexisNexis 2007), should also apply to the imposition of a sentence of life without parole because it qualifies as a "sentence enhancement."

[¶ 89] Taking all of Teniente's arguments into consideration, we stand by our holding in *Kenyon*. First, a sentence of life in prison without parole does not require the same degree of channeling of discretion or individualization of the ultimate sentencing decision as attends imposition of the death penalty. *Harmelin v. Michigan,* 501 U.S. 957, 995–996, 111 S.Ct. 2680, 2701–2702, 115 L.Ed.2d 836 (1991). Even the extreme sentence of life without parole is available for a variety of crimes in American jurisdictions, without departure from procedures provided for other non-capital sentences. *Holland v. Donnelly*, 216 F.Supp.2d 227, 245 (S.D.N.Y.2002). Considering the qualitative difference between the death penalty and any other punishment, our state's sentencing scheme is reasonable and does not offend the Constitution. See *Ewing v. California*, 538 U.S. 11, 28, 123 S.Ct. 1179, 1189, 155 L.Ed.2d 108 (2003) ("It

is enough that the [legislature] has a reasonable basis for believing that dramatically enhanced sentences 'advance[s] the goals of [its] criminal justice system in any substantial way.' "). Beyond that, however, sentencing by its very nature requires only the informed and reasonable exercise of discretion on the part of the district court. *Wilks v. State*, 2002 WY 100, ¶ 40, 49 P.3d 975, 991 (Wyo.2002) ("Trial courts have broad discretion to determine the appropriate length of imprisonment.").[10]

[¶ 90] Our holding in *Kenyon* applies to this case: That the sentence of life without parole under our current statute is not a sentence enhancement under *Apprendi* and does not require further fact-finding.[11] A sentence enhancement allows the sentence for a particular crime to be increased beyond the statutory maximum set for that offense when circumstances other than those used to define the offense are proven to exist. However, the maximum sentence allowed for first degree murder is life without parole (if the death penalty is not sought). Life without parole, then, is the upper limit of the range of non-capital punishment available under § 6–2–101(c).

[¶ 91] We next review Teniente's as applied challenge. To succeed in his claim, he must show that the statute provided insufficient notice to a person of ordinary intelligence that his conduct was illegal, and whether the facts of his case demonstrate arbitrary and discriminatory enforcement. *Lovato v. State*, 901 P.2d 408, 412 (Wyo. 1995). Teniente has failed to do so.

[¶ 92] The statute at issue states that the judge shall take into consideration "any evidence relevant to a determination of sentence which the court deems to have probative value." Again, this language reflects the tri-

---

10. Teniente advances an argument within this issue that § 6–2–101(c) is unconstitutional because our legislature has arbitrarily granted to some accused persons, but not others, the right to have a jury determine the sentence for first degree murder. Without an "official" argument to this issue, and without citation to pertinent authority, we will not evaluate this question with vigor. We will say, however, that life without parole is available as a punishment for a variety

of crimes without departure from the basic sentencing procedures provided for other non-capital sentences.

11. *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) ruled that factual findings that increase the maximum penalty must be considered an element of the offense and determined by a jury.

al court's broad discretion to determine the appropriate length of imprisonment within the legislatively mandated minimum and maximum sentence. *Kenyon*, ¶ 11, 96 P.3d at 1021–22. Here, the record clearly shows that Teniente was well aware of the trial court's ability to impose either life or life without parole. Defense counsel argued against a sentence of life without parole, while urging the court to consider Teniente's age, prior record, that he did not actually shoot the victim, that he was a productive member of society, took care of his family, who supported him, and that he had a "good heart." Teniente undoubtedly had a meaningful opportunity to argue to the trial court that life without parole was inappropriate and, in fact, did so at sentencing.

[¶ 93] During sentencing, the State painted an altogether different picture of Teniente. The court heard about his extensive criminal history, which included crimes of violence, his numerous probation violations, and his involvement in the death of Mr. Lopez.

[¶ 94] The question before us is whether or not a person of ordinary intelligence would know that his conduct was prohibited under § 6–2–101(c). The answer is yes.

[¶ 95] Teniente claims, but fails to establish, that he was the victim of arbitrary and discriminatory enforcement. Teniente points to two Wyoming cases, *Kenyon, supra*, 96 P.3d 1016, and *Bhutto v. State*, 2005 WY 78, 114 P.3d 1252 (Wyo.2005), where sentences of life without parole have been imposed since the enactment of § 6–2–101(c). Teniente argues that those cases gave him no notice that his conduct in this case would garner him two life without parole sentences. From our perspective, all three cases, including Teniente's, ended in homicide. Whether or not Teniente was the shooter is not determinative. Teniente was sentenced pursuant to Rule 32, W.R.Cr.P., and was sentenced only after a jury found him guilty of the crimes charged, and after the court was informed by both sides of the defendant's character, the nature of the crime, and its circumstances.

[¶ 96] Teniente's argument that his case differs substantially from two other "life without parole" cases is insufficient to demonstrate that he suffered arbitrary and discriminatory enforcement. For the foregoing reasons, the concurrent sentences of life without parole for the first degree murder conviction are affirmed.

Issue VIII—*Cumulative Error*

[¶ 97] Teniente claims that viewed separately, and as a whole, the errors in this case require reversal. However, when no error has occurred, a claim of cumulative error cannot be recognized. *Marquez v. State*, 941 P.2d 22, 26 (Wyo.1997). Because Teniente has not established error in the various issues he raises in this appeal, his claim of cumulative error fails.

## CONCLUSION

[¶ 98] For the foregoing reasons, Emilio Teniente's conviction and sentence is affirmed in all respects.