# THE SUPREME COURT, STATE OF WYOMING

# 2022 WY 135

OCTOBER TERM, A.D. 2022

November 2, 2022

CHERIE DAVIDSON-EATON,

Appellant
(Defendant),

v.

CHRISTY IVERSEN and SUSAN D. KIRK,
as co-personal representatives of the Estate of
Gale S. Iversen, deceased,

Appellees
(Plaintiffs).

S-22-0011

*Appeal from the District Court of Laramie County*
*The Honorable Thomas T.C. Campbell, Judge*

*Representing Appellant:*
    Bernard Q. Phelan, Cheyenne, WY.

*Representing Appellee:*
    John E. Masters, Cheyenne, WY.

*Before FOX, C.J., and KAUTZ, BOOMGAARDEN, GRAY and FENN, JJ.*

NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.

**FENN, Justice.**

[¶1]    Christy Iversen and Susan Kirk, co-personal representatives of the Estate of Gale S. Iversen (hereinafter "the Estate"), sued Cherie Davidson-Eaton (hereinafter "Ms. Eaton[1]"), Mr. Iversen's caregiver. The Estate filed an action for an accounting and sought to recover property it alleged Ms. Eaton unlawfully transferred to herself. Ms. Eaton in turn filed a creditor's claim against the Estate claiming a right to compensation for services she rendered to Mr. Iversen during his lifetime. When that claim was rejected, she sued the Estate in a separate action for breach of express contract, breach of implied contract, and quantum meruit. The district court consolidated the Estate's property claims with Ms. Eaton's lawsuit.

[¶2]    The district court granted partial summary judgment to the Estate on its real property claims. After a bench trial, it denied Ms. Eaton's claims and found the Estate was entitled to lost rents and profits. The district court ordered Ms. Eaton to provide the Estate with an accounting. Following a hearing on the accounting, the district court ordered Ms. Eaton to return all of Mr. Iversen's personal property in her possession and entered judgment against her for lost rents and equity. We affirm.

## ISSUES

[¶3]    Ms. Eaton presents several issues on appeal, which we rephrase as follows:

I.      Did the district court err when it declined to admit the testimony of Mr. Iversen's attorney and evidence of an unsigned will due to the attorney-client privilege?

II.     Was there sufficient evidence to support an express or implied agreement, which required Mr. Iversen to compensate Ms. Eaton for services she rendered to him during his lifetime through a legacy in his Estate?

III.    Was Ms. Eaton entitled to compensation for services she rendered to Mr. Iversen during his lifetime through a theory of unjust enrichment?

IV.     Did the district court err when it found the quitclaim deeds executed by Ms. Eaton were an invalid transfer of real property?

V.      Did the district court err by not considering the Estate's failure to mitigate its damages through a foreclosure redemption when it awarded damages for the loss of equity?

---

[1] Ms. Eaton testified her formal name is Cherie Davidson-Eaton. In her brief and during trial, she is referred to as Cherie Eaton. Accordingly, we refer to her as Ms. Eaton throughout this opinion.

1

VI.     Was the district court's decision to enter judgment against Ms. Eaton for rent supported by sufficient evidence and in accordance with law?

## FACTS

[¶4]    This case arose from a dispute about who was entitled to Gale Iversen's property upon his death, his Estate or Ms. Eaton. Prior to his death, Mr. Iversen possessed and had ownership interests in three parcels of real estate in Laramie County, Wyoming: (1) a house, outbuildings, and land on Primrose Trail; (2) a townhouse on Dean Paul Drive; and (3) an undivided half interest in his parents' home on Plum Drive. He also had various personal property in dispute.

**Ms. Eaton's Association with Mr. Iversen**

[¶5]    In 2011, Ms. Eaton lived next door to Mr. Iversen's parents on Plum Drive. She developed a friendship with them and "used to shovel their walks during the winter" and trimmed their hedges and bushes in the summer. Ms. Eaton received housing assistance from the Cheyenne Housing Authority. In December 2011, the housing authority required her to recertify her lease. However, her landlord declined to renew her lease, which expired in March 2012. In February 2012, she asked Mr. Iversen's mother to have Mr. Iversen call her about his townhouse on Dean Paul Drive that was listed for sale. This resulted in Mr. Iversen agreeing to rent his townhouse to Ms. Eaton. To receive housing assistance, the housing authority required Ms. Eaton's rental to meet certain requirements, so Mr. Iversen and Ms. Eaton repaired items at the townhouse to meet those requirements.

[¶6]    Ms. Eaton did not hear from Mr. Iversen for a period of time before moving into the townhouse—she worried he changed his mind about renting her the townhouse and possibly sold the home. Ms. Eaton called Mr. Iversen's mother who stated she would check on Mr. Iversen. His mother called Ms. Eaton and informed her Mr. Iversen was sick and asked if she could possibly take him to his doctor's appointment the next day. Ms. Eaton agreed, and the next day she went with Mr. Iversen to his appointment. While waiting in the lobby, a nurse approached her and stated Mr. Iversen had a serious infection in his foot, so they were going to admit him to the hospital. The nurse told Ms. Eaton she needed to take Mr. Iversen to the hospital because he refused transportation by ambulance. Ms. Eaton went with Mr. Iversen to the hospital and made sure he checked in. At the hospital, Mr. Iversen asked Ms. Eaton to contact his neighbor, and then take his dogs to his parents' home and purchase food for the dogs. Ms. Eaton did as Mr. Iversen asked and continued to check in on him and his pets.

[¶7]    Ms. Eaton visited Mr. Iversen on a daily basis at the hospital. On one visit, she informed Mr. Iversen of a conversation she had with his mother about placing him in a nursing home once he was released. Mr. Iversen feared being placed in a nursing home,

2

so he asked Ms. Eaton to speak to his lawyer, Tom Lee. Mr. Lee represented Mr. Iversen in a pending personal injury action involving Mr. Iversen being hit by a motor vehicle while riding his bicycle, which was being negotiated for settlement. Ms. Eaton contacted Mr. Lee, and he visited Mr. Iversen in the hospital. Their conversation caused Mr. Lee to believe a guardian ad litem was necessary before any settlement could be accepted in the personal injury case due to Mr. Iversen's limited competency.

[¶8]    In March of 2012, before executing any lease agreement and while Mr. Iversen was presumably still in the hospital, Ms. Eaton moved into his townhouse on Dean Paul Drive. A written lease agreement for the property was executed on May 9, 2012. The terms of the lease required Ms. Eaton to remit a deposit of $600 and pay Mr. Iversen $708 per month. Ms. Eaton paid the deposit, but never paid Mr. Iversen rent. Mr. Iversen did however receive a subsidy through Ms. Eaton's housing assistance, which he used to pay the mortgage on Dean Paul Drive. Ms. Eaton testified the terms of her lease never changed from May 2012 to 2017.

[¶9]    During this same period, Mr. Iversen was discharged from the hospital. His discharge was conditioned upon someone taking him to his follow-up appointments. Ms. Eaton informed the hospital she was willing to do that. Ms. Eaton provided in-kind services to Mr. Iversen in lieu of rent, which included taking him to his medical appointments. Over time, Ms. Eaton became more involved in Mr. Iversen's care, including going to appointments with him, monitoring his medications and health, changing his wound dressings, cooking for him, bathing him, helping him get dressed, and helping him with his mobility exercises. Mr. Iversen began helping Ms. Eaton financially, which included paying for her gas, the utilities at the townhouse, medical bills, car repairs, and buying her personal items. Mr. Iversen and Ms. Eaton's relationship evolved and grew, and they interacted with one another on a daily basis. They rode bicycles, shared meals, went to lunch with his family, ran errands, and stayed at each other's homes.

**Other Legal Proceedings involving Mr. Iversen**

[¶10]  During this same time period, Mr. Lee requested the appointment of a guardian ad litem to review a settlement in the pending personal injury matter. The record is unclear, but at some point, a settlement was proposed in the personal injury action, and the district court appointed Laura Jackson as Mr. Iversen's guardian ad litem in a proceeding in 2012. Ms. Eaton was concerned the settlement was too low, so she advised Mr. Iversen to speak with another attorney. Ms. Eaton knew Henry Bailey, so she approached Mr. Bailey to attain a higher settlement for Mr. Iversen. Mr. Bailey agreed to represent Mr. Iversen, and while the record is unclear, it appears Mr. Iversen terminated his attorney-client relationship with Mr. Lee. Mr. Bailey entered an appearance in the pending personal injury action and the 2012 proceeding involving Ms. Jackson. He also filed a separate action against Mr. Iversen's insurance company seeking additional recovery through his underinsured motorist policy. The record is unclear, but it appears Mr. Iversen settled the

3

personal injury action for policy limits. Mr. Bailey was concerned the money from the settlement would go to pay for the guardian ad litem and diminish Mr. Iversen's ultimate recovery, so he asked the district court to terminate Ms. Jackson's appointment. He testified Mr. Iversen was lucid enough to give him directions, but in doing so Mr. Iversen needed Ms. Eaton's assistance.

[¶11] Mr. Bailey testified that, during his representation, Ms. Eaton always accompanied Mr. Iversen to meetings. When asked if Ms. Eaton was Mr. Iversen's caregiver, Mr. Bailey testified he "believed at the time that she was his girlfriend or had some kind of a relationship like that with him." He stated Mr. Iversen depended on Ms. Eaton and needed her help in preparing his documents for the underinsured motorist proceeding. He testified Ms. Eaton exerted influence over Mr. Iversen, especially near the end of the representation. Mr. Bailey also testified he was aware Ms. Eaton held a power of attorney on behalf of Mr. Iversen but could not verify what power of attorney he had seen.[2]

[¶12] When the underinsured motorist coverage matter settled, Mr. Bailey was concerned about delivering the funds directly to Mr. Iversen. He believed the funds would possibly be spent improperly and in a way that would not benefit Mr. Iversen. He observed Mr. Iversen's capacity was diminished beyond that of a normal person, so he arranged for Doug Bailey, another lawyer with his law firm, to file an involuntary petition to appoint the Wyoming Guardianship Corporation as Mr. Iversen's guardian and conservator. Around this same time, Ms. Eaton called Henry Bailey to discuss her frustrations with his law partner, Mr. Lance Harmon. In the phone call, Ms. Eaton told Mr. Bailey she was upset because she had asked Mr. Harmon to draft a will for Mr. Iversen, but he declined to do so. She said Mr. Harmon was unwilling to draft a will because "he didn't feel Mr. Iversen was competent to execute a will."

[¶13] Around this same timeframe in 2016, Ms. Eaton went to Office Depot and obtained a power of attorney form titled "Durable Limited Power of Attorney: Effective Only Upon Disability." Mr. Iversen executed this power of attorney in front of two witnesses at ANB Bank on June 30, 2016. Shortly thereafter, in September 2016, Mr. Iversen received a letter from Mr. Bailey about the involuntary conservatorship/guardianship, which caused Ms. Eaton to "facilitate [Mr. Iversen] finding a lawyer to represent him in that matter." Ms. Eaton testified "[w]e hire[d] Sue Davidson" because of the letter from Mr. Bailey. Ms.

---

[2] During the trial, counsel for the Estate referenced Exhibits 8 and 9 during Mr. Bailey's testimony, which were allegedly powers of attorney executed on November 19, 2013, granting Ms. Eaton authority over Mr. Iversen and his affairs. The transcript indicates the power of attorneys executed in 2013 are entitled: (1) Durable Limited Power of Attorney Effective Upon Disability and (2) Unlimited Power of Attorney. The exhibits were never admitted into evidence, so we cannot verify from the record what powers of attorney Ms. Eaton held in 2013. In her testimony, she stated she had medical power of attorney that was executed at a hospital in 2013, and another power of attorney from 2013 contained a notary error, so a new power of attorney was executed in 2016. She testified to obtaining several different power of attorney forms, but only one power of attorney from June 30, 2016, appears in the record.

4

Davidson testified Mr. Iversen originally sought her services "because of an involuntary guardianship petition that had been filed by Mr. Bailey, seeking a conservator being appointed for him, and then . . . later amended to include a guardianship request." Ms. Davidson testified Ms. Eaton transported Mr. Iversen to and from her office, and always accompanied him to his appointments.

[¶14] On October 13, 2016, Ms. Davidson filed a limited entry of appearance in the involuntary guardianship/conservatorship matter, which indicated she represented Ms. Eaton, not Mr. Iversen. Several months later, Ms. Davidson filed a competing voluntary petition to appoint Ms. Eaton as Mr. Iversen's guardian, and Ms. Eaton and/or Mr. Keith Price, his certified public accountant, as his conservator on a permanent basis. She further moved to dismiss the involuntary petition filed by Mr. Bailey. The voluntary petition stated Mr. Iversen was "an incompetent person." The district court consolidated the two guardianship/conservatorship petitions and appointed John Frentheway as the guardian ad litem for Mr. Iversen. The district court tasked Mr. Frentheway with determining if Mr. Iversen needed a conservator and whether he had the capacity to manage his personal and financial affairs. During his investigation, Mr. Frentheway observed Mr. Iversen was totally dependent on Ms. Eaton.

**Mr. Iversen's Passing and Ms. Eaton's Execution of Deeds**

[¶15] Sometime in spring of 2017, Mr. Iversen was admitted to Cheyenne Regional Medical Center for unknown health reasons. Shortly thereafter, hospital staff wanted to find a placement for Mr. Iversen where he could go to receive palliative and geri-psychiatric care. Ultimately, in May 2017, Mr. Iversen was transferred to a skilled nursing facility in Fort Collins, Colorado. He was admitted to Poudre Valley hospital on July 6, 2017, for congestive heart failure. Ms. Eaton met with the Poudre Valley hospital staff and discussed that "she has been [Mr. Iversen's] primary caregiver for the past 5 years [and] has been providing 24 [hour] care[] to [Mr. Iversen] in his home for the last 1.5 years." The medical records from Poudre Valley referred to Ms. Eaton as Mr. Iversen's significant other, and included her statement that Mr. Iversen was her best friend. The records further indicated that she told the staff "once [Mr. Iversen] passes away she will have 'nothing, no income, no job, and no house.'"

[¶16] Sometime in July 2017, a few weeks before Mr. Iversen's death, Ms. Eaton contacted Ms. Davidson to prepare deeds to transfer Mr. Iversen's real property to herself and Mr. Iversen with rights of survivorship. Ms. Davidson prepared the deeds without making any independent determination about Mr. Iversen's competency. Additionally, Mr. Frentheway had not reported his opinions about Mr. Iversen's competency and capacity in the guardianship/conservatorship proceeding that Ms. Davidson had filed on Mr. Iversen's behalf. The record is not clear as to whether Ms. Davidson spoke with Mr. Frentheway before preparing the deeds.

5

[¶17] On July 30, 2017, Mr. Iversen was admitted to Banner Fort Collins Medical Center. A few days later, on August 3, 2017, his attending physician executed a letter stating: "[Mr. Iversen] remains in critical condition and is unable to speak for himself. He currently does not have the awareness or capacity for decision making." On that same day, Ms. Eaton executed three quitclaim deeds, transferring Mr. Iversen's interest in his three real properties (Plum Drive, Dean Paul Drive, and Primrose Trail) to herself and Mr. Iversen as "joint tenants with rights of survivorship" utilizing the power of attorney executed on June 30, 2016. Ms. Eaton executed the deeds just twenty-four hours prior to Mr. Iversen's death. Five days later, after Mr. Iversen's passing, Ms. Eaton recorded the deeds, a copy of the 2016 power of attorney, and a copy of the letter from Mr. Iversen's physician. The deed to the property on Plum Drive, included the wrong legal description, so Ms. Eaton recorded the same notarized deed, with handwritten changes to the legal description and the initials CDE written above the changes, on August 11, 2017.

## Foreclosure of Dean Paul Drive Property

[¶18] On September 1, 2017, Ms. Eaton called the Cheyenne Housing Authority stating Mr. Iverson was behind on his mortgage payments and she thought her rental on Dean Paul Drive might be taken by the bank. Shortly after this call, the housing authority determined Ms. Eaton was no longer entitled to benefits because she was now the record owner of Dean Paul Drive. A month later, a law firm representing Mr. Iversen's mortgage company sent a letter to Mr. Iversen at the Dean Paul Drive address and to the co-personal representatives of his Estate. The letter stated Mr. Iversen was in default under the terms of his mortgage on Dean Paul Drive, and "as a result, the balance will be accelerated and the entire unpaid amount due in full unless the default is cured within thirty (30) days" or certain provisions to cure the default were met. The letter indicated Mr. Iversen was "in breach of the note and mortgage by failing to pay monthly principal and interest payments . . . for the months of September and October 2017 . . . and by transferring the mortgaged property without [the bank's] consent." Neither the Estate nor Ms. Eaton cured the default. The bank foreclosed on the property and sent the excess proceeds to the Estate.

## Course of Proceedings

[¶19] On September 21, 2017, Mr. Iversen's Estate sued Ms. Eaton, alleging she unlawfully transferred Mr. Iversen's real property to herself. It sought an order quieting title to the property in the Estate, an order declaring the deeds Ms. Eaton recorded were void, and an order ejecting her from the property. The Estate also alleged Ms. Eaton was acting as a fiduciary under the power of attorney, and as such she "must properly account to [the Estate] for her actions as a fiduciary and deliver all remaining assets in her possession to the [Estate] for inclusion within the decedent's estate." It further requested the district court to enter judgment requiring her to repay the Estate for any assets she improperly disposed of or transferred after Mr. Iversen's death.

6

[¶20]   Ms. Eaton filed an answer and counterclaim "admit[ting] that she was given a notice to vacate and surrender the named properties [but] that she has not vacated and surrendered the properties as she is now the record sole or concurrent owner of such."   She counterclaimed asking the district court to quiet title to her.  At some point, Mr. Iversen's will was admitted to probate naming his daughter, Christy Iversen, and a friend, Susan Kirk, as co-personal representatives.  Ms. Eaton then filed a creditor's claim against the Estate based upon the law of an implied contract in the amount of $408,000 for compensation she claimed she was owed for care and services she provided to Mr. Iverson during his lifetime.  The co-personal representatives denied the claim.

[¶21]   After the creditor's claim was denied, Ms. Eaton filed a separate action against the Estate alleging breach of an express contract, breach of an implied contract, and a claim of quantum meruit.  The Estate filed an answer and counterclaim restating its claims from its complaint, and claiming any alleged agreement was "the product of an agreement with an incompetent person or the product of undue influence or duress or the invalid exercise of a defective power of attorney."  The Estate further alleged any relief to Ms. Eaton was barred by her unclean hands, and it should be awarded damages for lost property and benefits caused by her conduct.  Upon the parties' joint motion, the district court consolidated the Estate's claims against Ms. Eaton with Ms. Eaton's claims against the Estate.

[¶22]   The Estate moved for partial summary judgment on its property claims.  In response, Ms. Eaton untimely filed an affidavit asserting material issues of fact.  Although it was filed outside the time allotted, the district court considered the affidavit and found it did not raise any factual dispute.  Ms. Eaton filed no other response to the motion.  The district court granted the Estate's motion and ruled the property deeds Ms. Eaton recorded were invalid and void, and it ordered that title be quieted in Mr. Iversen, his Estate, and his heirs and beneficiaries.  The district court further ruled the Estate was entitled to judgment on its ejectment claim.  It ordered Ms. Eaton to vacate the property and "remove therefrom only her personal property leaving all other property of the decedent, Gale S. Iversen, in as good shape and condition as when she took possession."  Ms. Eaton appealed the order— her first appeal.

[¶23]   During the pendency of her first appeal, Wyoming Supreme Court Docket No. S-19-0072, the Estate requested the district court order Ms. Eaton to vacate the premises in accordance with its ruling on partial summary judgment or, in the alternative, to post a supersedeas bond in an amount that "will secure the amount recovered for the use and detention of the property, the costs of the action, costs on appeal, interest, and damages for delay."  The Estate contended Ms. Eaton had been in possession of the Estate's property since Mr. Iversen's death and continued to refuse to return the property.  The district court held a hearing and found the Estate "has an interest in retaking possession of the real property and also in gaining access to, or possession of, the personal property located at the real property over which [Ms.] Eaton has made no claim."  The district court ordered if Ms. Eaton was going to remain in the property, within 14 days of May 22, 2019, she had

7

to "grant [the Estate] access to the property at . . . Primrose Trail for purposes of inventorying, marshalling, possessing, and identifying all personal property at that location." It further ordered Ms. Eaton to "remit in cash or certified funds . . . the amount of One Thousand Dollars ($1,000)" to the Estate on a monthly basis. The district court held "[s]uch payments are not rent for the property but shall be a form of bond pending appeal by [Ms. Eaton] and shall be subject to rules and laws concerning bonds posted on appeal." The district court ordered if Ms. Eaton violated either of the two conditions, her continued occupancy would be immediately terminated, and she would be subject to eviction. We dismissed the first appeal because the order was not a final appealable order.[3]

[¶24] The district court held a bench trial on August 19 through August 21, 2019, on Ms. Eaton's claims and the Estate's remaining claim for an accounting. At the trial, Ms. Eaton requested to admit 11,000 pages of medical records, but in lieu of admitting the records the Estate and Ms. Eaton stipulated to the following:

> 1. [Mr. Iversen] suffered from extensive medical conditions during the time that [Ms. Eaton] was his caregiver, including diabetes mellitus, kidney failure, congestive heart failure, traumatic brain injury, infected toe ulcer, amputation of his toes, vascular disease, hypertension, stroke, and other serious conditions.
>
> 2. Ms. [Cherie] Eaton was [Mr. Iversen]'s caregiver during . . . the last five years of his life
>
> 3. [Mr. Iversen] opposed placement in the nursing home and rejected that concept on several occasions.

The district court issued an "Order and Opinion" on December 19, 2019, ruling against Ms. Eaton on all her claims, and with respect to the Estate's remaining claim found:

> [I]t is not appropriate to impose a complete fiduciary responsibility on [Ms.] Eaton and make her account. However, as to the transfer of titles to vehicles or real property, or of moneys in and out of [Mr. Iversen's] bank and investment accounts, she was a fiduciary as she acted only through the limited grant of authority of the power of attorney and must account in response to a specific demand by the Estate.
>
> [The] Estate is entitled also to loss of rents and profits on real

---

[3] *Davidson-Eaton v. Iversen*, S-19-0072 (Wyo. April 30, 2019) (order dismissing appeal).

estate properties unlawfully transferred, in addition to the amounts revealed by the accounting ordered.

The district court ordered Ms. Eaton to file her accounting within 30 days.

[¶25]  Ms. Eaton filed a motion to alter or amend the order under Rule 59 of the Wyoming Rules of Civil Procedure, and on January 21, 2020, she filed her second appeal to this Court.  During the pendency of the second appeal, the Estate renewed its motion to enforce the judgment, and Ms. Eaton asked the district court to stay enforcement pending the appeal.  The district court held a hearing and ordered Ms. Eaton to "surrender possession and vacate the premises . . . on or before 5:00 p.m. on March 8, 2020."  It further denied Ms. Eaton's request for a stay and ordered her to provide the accounting as previously ordered.  Ms. Eaton vacated the property on March 5, 2020, and when she did so, she removed several items of personal property belonging to the Estate.  The Estate filed a motion for an order to show cause asking the district court to hold Ms. Eaton in contempt and require her to immediately account for and return the missing property.  Ms. Eaton filed her accounting on May 18, 2020, approximately five months after the district court's deadline.

[¶26]  The district court held an evidentiary hearing on the motion for contempt and the accounting on June 23, 2020, and when the time scheduled for the hearing proved insufficient, it continued the hearing to August 4, 2020.  The district court entered its Order on Accounting and accepted Ms. Eaton's accounting in part but found it was untimely and self-serving.  It ordered Ms. Eaton to:

> a.  Return all title and possession of all Mr. Iversen's vehicles, or trailers transferred by her or stored at any location.
>
> b.  Return all of Mr. Iversen's weapons in her control and those in the hands of her mother Amy Davidson.
>
> c.  Return all of Mr. Iversen's tools, furniture and items of personal property in her possession which she has acknowledged [were] his and stored by her.
>
> d.  Pay rents for her occupation of the Primrose Trail property from August 2017 through March 2020 in the amount of $31,000.
>
> e.  Pay the [loss of equity] previously ordered for the Dean Paul property in the amount of $23,763.

The district court further ordered the accounting to be reduced to a judgment.  After Ms.

Eaton returned the property, the Estate was to prepare a notice of unreturned items and their value, along with a proposed judgment reflecting the amounts of those items.

[¶27]  Ms. Eaton filed a third appeal regarding the Order on Accounting, while her second appeal was still pending.  We dismissed the third appeal on March 9, 2021, finding the Order on Accounting was not a final appealable order.[4]  Following briefing from the parties and oral argument, we dismissed the second appeal for a lack of jurisdiction finding both the order following trial and the subsequent order entitled "Order on Accounting" indicate "a final judgment on damages will not be entered until the accounting is complete." *Davidson-Eaton v. Iversen*, 2021 WY 49, ¶ 13, 484 P.3d 23, 25–26 (Wyo. 2021).

[¶28]  Ms. Eaton filed her report showing compliance with the district court's Order on Accounting, and the district court entered its final judgment on October 28, 2021.  It found Ms. Eaton "did not pay the $1000 monthly amount previously ordered by the [c]ourt, nor did she timely vacate the property as ordered."  The district court held the Estate was "entitled to judgment for rents and profits while deprived of the use of the real property as follows:"

> a.  Date of death, August 4, 2017[,] until surrender of Primrose property in March 2020, (5 months in 2017, 12 months in 2018, 12 months in 2019, 2 months in 2020, or a total of 31 months) at $1,000 per month: $31,000, less one month[] paid by [Ms. Eaton], for a net amount of $30,000.00.
>
> b.  Loss of Dean Paul property to foreclosure while in possession of [Ms. Eaton], $23,763.

The district court further ordered Ms. Eaton to pay a transportation fee for a trailer she removed from Mr. Iversen's property and costs incurred by the Estate in filing the quiet title action.  It entered judgment against Ms. Eaton.  Ms. Eaton timely filed her fourth appeal.

## DISCUSSION

### I.  *Attorney-Client Privilege and the Unsigned Will*

[¶29]  To corroborate Ms. Eaton's claim that Mr. Iversen agreed to pay for her caregiving services out of a legacy from his Estate, she sought to introduce the testimony of Ms. Davidson, and an unsigned will Ms. Davidson drafted for Mr. Iversen.  The district court declined to admit the unsigned will, finding it was irrelevant to the issue of whether an agreement had been formed because it was never executed.  The Estate asserted the

---

[4] *Davidson-Eaton v. Iversen*, S-21-0041 (Wyo. March 9, 2021) (order dismissing appeal).

10

attorney-client privilege on Mr. Iversen's conversations with Ms. Davidson, and Ms. Eaton argued the privilege was waived. The district court held the conversations between Ms. Davidson and Mr. Iversen remained privileged even though Ms. Eaton was present because the conversations were between two people who might both be clients of Ms. Davidson and owed a duty of confidentiality to each other. It held Ms. Davidson could not testify on matters involving drafting estate documents or conversations with Mr. Iversen because Mr. Iversen and the Estate had not waived the privilege.

[¶30] On appeal, Ms. Eaton claims Ms. Davidson's testimony was not privileged or confidential because the conversations occurred with both Mr. Iversen and Ms. Eaton present. She claims Mr. Iversen waived the attorney-client privilege when he allowed the conversations to occur in front of Ms. Eaton—a third party who was not a client. She further claims the attorney-client privilege does not apply to the unsigned will because it is a non-confidential document.

[¶31] We review the district court's decision to exclude the unexecuted will and conversations with Mr. Iversen's attorney for an abuse of discretion. *In re L-MHB*, 2020 WY 1, ¶¶ 12–13, 454 P.3d 935, 938 (Wyo. 2020) (reviewing a claim of waiver and the physician-patient privilege for an abuse of discretion); *Arnold v. Mountain W. Farm Bureau Mut. Ins. Co.*, 707 P.2d 161, 165 (Wyo. 1985) (reviewing the district court's ruling on the attorney-client privilege for an abuse of discretion); *see also WyoLaw, LLC v. Off. of Att'y Gen., Consumer Prot. Unit*, 2021 WY 61, ¶ 49, 486 P.3d 964, 977 (Wyo. 2021) ("We review a district court's discovery rulings, including its ruling on a claim of privilege, for an abuse of discretion."). We will not disturb the district court's decision if there is a legitimate basis for the ruling. *In re L-MHB*, ¶ 12, 454 P.3d at 938. "Determining whether the trial court abused its discretion involves [considering] whether the court could reasonably conclude as it did, and whether it acted in an arbitrary and capricious manner." *Jontra Holdings Pty Ltd v. Gas Sensing Tech. Corp.*, 2021 WY 17, ¶ 58, 479 P.3d 1222, 1239 (Wyo. 2021). Ms. Eaton "bears the burden of showing an abuse of discretion." *See In re L-MHB*, ¶ 12, 454 P.3d at 938.

[¶32] An attorney is statutorily prevented from testifying about "a communication made to him by his client or . . . his advice to his client." Wyo. Stat. Ann. § 1-12-101(a)(i) (LexisNexis 2019). "The decision whether to waive the attorney-client privilege" or to expressly consent to the attorney testifying "belongs solely to the client." *Dockter v. Lozano*, 2020 WY 119, ¶ 29, 472 P.3d 362, 370 (Wyo. 2020) (quoting *Teniente v. State*, 2007 WY 165, ¶ 47, 169 P.3d 512, 528 (Wyo. 2007); Wyo. Stat. Ann. § 1-12-101(a)(i). The attorney-client privilege, which prevents an attorney from testifying, survives the death of the client, and the personal representative can assert the privilege on behalf of the decedent. W.R.E. 501 (LexisNexis 2021) ("[T]he privilege of a . . . person . . . shall be governed by the principles of the common law as they may be interpreted by the courts of the State of Wyoming in the light of reason and experience."); *Swidler & Berlin v. United States*, 524 U.S. 399, 405–11, 118 S. Ct. 2081, 2085–88, 141 L.Ed.2d 379 (1998) ("It has

11

been generally, if not universally, accepted, for well over a century, that the attorney-client privilege survives the death of the client."); 1 *McCormick on Evidence* § 94 (8th ed. July 2022); Eunice L. Ross and Thomas J. Reed, *Will Contests* § 15:15 (2d ed. June 2022).

[¶33] "[A]ttorney-client communications in the presence of third persons are [generally] not privileged as confidential [and will] defeat the privilege regarding a testator's communications to the attorney during will drafting." 98 C.J.S. *Witnesses* § 364 (Oct. 2022 update); 1 *McCormick on Evidence* § 91 (8th ed. July 2022); *Thomas v. Harrison*, 634 P.2d 328, 337 (Wyo. 1981) ("Generally, it is assumed that communications between a client and a third party or one who is not a lawyer are not protected."). To determine whether Ms. Eaton's presence defeated the attorney-client privilege, we must determine whether Ms. Eaton was Mr. Iversen's agent. Restatement (Third) of the Law Governing Lawyers § 70 (Am. Law Inst. 2000); 1 *McCormick on Evidence* § 91 (8th ed. July 2022); John M. Burman, *The Attorney-Client Privilege Part II, Waiver and Exceptions*, Wyoming Lawyer at 32, 33–34 (Feb. 2006). If Ms. Eaton is an agent of Mr. Iversen, the communication is deemed confidential, and her presence did not waive the attorney-client privilege. Restatement (Third) of the Law Governing Lawyers § 70(e) (Am. Law Inst. 2000); 1 *McCormick On Evidence* § 91 (8th ed. July 2022); *see also* 98 C.J.S. Witnesses § 348 (Oct. 2022 update) ("Accepted third parties, with whom the privilege is preserved, are those who are necessary agents of the . . . client, persons to whom disclosure is made in furtherance of the rendition of professional legal services to the client, or those reasonably necessary for the transmission of the communication."); Burman, *supra*, at 32, 33–34 (discussing the attorney-client privilege is not waived in the presence of a third party if that person is needed to make the conference possible and that when two or more persons employ an attorney as their common attorney the communications with the attorney are regarded as confidential).

[¶34] In *McCaffrey v. Estate of Brennan*, the Missouri Court of Appeals considered whether the presence of the creditor during conversations between a decedent and his attorney waived the attorney-client privilege and permitted a decedent's attorney to testify about an unexecuted will in a claim against the estate. 533 S.W.2d 264, 265–68 (Mo. App. 1976). Plaintiff brought an action against decedent's estate for services—banking, bill-paying, running errands, chauffeuring, and visiting the decedent in a hospital and nursing home—rendered to the deceased during the deceased's lifetime. *Id.* at 265. Plaintiff rendered these services continuously for over eight years, but the decedent never compensated plaintiff. *Id.* Instead, the decedent promised he would make an adequate provision for the plaintiff in his will. *Id.* In preparation of a will, the decedent's attorney met with decedent only twice, and the plaintiff was present on both of those occasions. *Id.* The decedent's attorney prepared a power of attorney on behalf of the decedent, which granted plaintiff a blanket power to act on decedent's behalf. *Id.* His attorney also prepared a will with a bequest to plaintiff. *Id.* The decedent never executed the draft will. *Id.*

[¶35] Following decedent's death, plaintiff filed a quantum meruit claim against the

estate. *Id.* During the trial, the plaintiff called decedent's attorney as a witness, and over the objections of the estate, the court permitted the attorney to testify that he prepared a will for the decedent with a bequest of money to plaintiff, though it was never executed. *Id.* The court never admitted the unexecuted will. *Id.* at 265–66. On appeal, the estate contended the trial court erred because the attorney-client privilege barred the attorney's testimony regarding the preparation of an unexecuted will. *Id.* at 266–68. The plaintiff asserted the attorney-client privilege was destroyed by his presence during the communication. *Id.* at 267. The court found the plaintiff's dealings with decedent's attorney were pursuant to her agency relationship with the deceased, and therefore the testimony was barred by the attorney-client privilege. *Id.* at 267–68. It reasoned:

> As a general rule, the privilege is destroyed by the presence and hearing of third persons, on the ground that the communication was never intended to be confidential. However, preparation of a will is typically a matter which a client would expect to be confidential and therefore privileged. And the rule as to the absence of privilege where a third person is present does not apply when the third person is the confidential agent of either the client or the attorney. Similarly, when a communication meets all the legal requirements entitling it to be privileged when made directly between an attorney and his client, it is equally privileged when the communication is made through the client's agent or employee. In other words, **it is the function of the third party—his relationship to the client—which determines whether the privilege encompasses communications made by, or in the presence of that third party.** During the entire claim period, decedent held plaintiff in a position of trust and authority such that her agency would be implied. Beginning April 19, 1968, her agency was validated by a blanket power of attorney running from decedent to her. All of plaintiff's dealings with Mr. Flynn were pursuant to her agency relationship to the deceased. Therefore, these communications were encompassed within the attorney-client privilege. The privilege was neither destroyed by her presence nor waived by failure to object. Mr. Flynn's testimony should have been barred by the attorney-client privilege.

*Id.* at 267–68 (internal quotations and citations omitted) (emphasis added).

[¶36] Ms. Eaton testified that Mr. Iversen executed a medical power of attorney at the hospital in fall of 2013 granting her the power to make healthcare decisions on his behalf. She further testified "[i]t was Mr. Iversen's wish that [she] have . . . power [of attorney

over him] from . . . 2013." She testified there was a second power of attorney executed on June 30, 2016, several months before Ms. Eaton and Mr. Iversen met with Ms. Davidson. Ms. Eaton was also a signatory on Mr. Iversen's checking account.

[¶37] Ms. Davidson began her representation of Mr. Iversen knowing another attorney filed for an involuntary guardianship and conservatorship due to his concerns about Mr. Iversen's competency. She testified she "was aware that there was one or more powers of attorney." She entered a limited entry of appearance on behalf of Ms. Eaton to obtain court records in the involuntary guardianship/conservatorship proceeding. Ms. Eaton testified "we hire[d] Sue Davidson"—meaning she and Mr. Iversen hired Ms. Davidson. Ms. Davidson prepared, executed, and notarized a voluntary petition for appointment of guardian and conservator on behalf of Mr. Iversen stating he was "an incompetent person." The voluntary petition requested Ms. Eaton be appointed as Mr. Iversen's guardian and conservator. Ms. Eaton accepted service and consented to being appointed as the guardian and sole or joint conservator of Mr. Iversen—Ms. Davidson notarized the acceptance and consent.

[¶38] Ms. Davidson was aware Mr. Iversen suffered from a traumatic brain injury. By the time Ms. Davidson was hired, two of Mr. Iversen's previous attorneys had filed petitions to appoint a guardian or guardian ad litem for him due to their concerns about his competency. Another attorney declined to draft a will on Mr. Iversen's behalf because "he didn't feel Mr. Iversen was competent to execute a will." Mr. Iversen's medical records from 2013 stated "Not sure if he can comply with instructions when his girlfriend is not with him due to his memory difficulty." Henry Bailey, testified Mr. Iversen "had trouble remembering things," and he opined Mr. Iversen's "capacity was diminished beyond that of a normal person." Mr. Bailey further testified Mr. Iversen needed "the help of Cherie Eaton in visiting with [him and] in preparing his documents for the underinsured motorist proceeding." Further, in 2015, a criminal case against Mr. Iversen was dismissed because he was unfit to stand trial due to his inability to aid in his defense.

[¶39] A letter from his physician at the Cheyenne Veteran's Administration, which was received and read by Ms. Eaton before meeting with Ms. Davidson, set forth the following "to be considered for [Mr. Iversen's] future medical care and/or legal issues:"

> Mr. Iversen has significant dementia, and has been determined as officially "incompetent" of giving consent in 2012 by the VA-Mental Health Team. He is very confused most of the time and [is] absolutely unable to remember any of his medications, dosages, timing or food intake. He is probably unable to perform most of the Activities of Daily Living without frequent reminding and guidance. He is unable to drive.

\* \* \*

14

Finally, Mr. Iversen has been cared for by [Ms. Eaton] for the last several years. She is currently his Power of Attorney. . . .

The progress notes from Mr. Iversen's health records show the nurses frequently spoke with Ms. Eaton about his care.

[¶40]   We find this case is similar to *McCaffrey* and hold the district court did not abuse its discretion when it excluded Ms. Davidson's testimony and refused to admit the unsigned will.  Based on the evidence discussed above, we conclude Ms. Eaton was acting as Mr. Iversen's agent when she attended the meetings with Ms. Davidson where the unexecuted will was discussed.  Therefore, we find her presence during these discussions did not destroy any privilege.

## II. *Ms. Eaton's Claims for Breach of an Express or Implied Contract*

[¶41]   Ms. Eaton next contends the district court erred when it found there was no express or implied-in-fact agreement between her and Mr. Iversen.  She argues that even without considering the unsigned will, "there is ample evidence of an express or implied agreement . . . that the decedent would [compensate her for] services [rendered] through a legacy in his will."  The Estate argues the evidence in the record is consistent with the district court's finding that there was no agreement, and it contends even if there was an oral agreement, it is not enforceable because the terms were a moving target and did not form a definitive contract.

[¶42]   The question of "[w]hether an oral contract exists is a question of fact," "and the district court's determination on that question will not be reversed unless clearly erroneous." *Meima v. Broemmel*, 2005 WY 87, ¶ 58, 117 P.3d 429, 448 (Wyo. 2005) (quoting *Fowler v. Fowler*, 933 P.2d 502, 504 (Wyo. 1997)); *Gould v. Ochsner*, 2015 WY 101, ¶ 53, 354 P.3d 965, 979 (Wyo. 2015) (quoting *Simek v. Tate*, 2010 WY 65, ¶ 19, 231 P.3d 891, 898 (Wyo. 2010)).  We do not reweigh the evidence, instead "we examine the evidence in a light most favorable to the prevailing party, without considering evidence of the other party which conflicts." *Belden v. Thorkildsen*, 2008 WY 145, ¶ 22, 197 P.3d 148, 155 (Wyo. 2008) (quoting *71 Const. v. Wesco Elec., Inc.*, 924 P.2d 991, 993 (Wyo. 1996)).  Ms. Eaton bears the burden of establishing the existence of the oral contract. *Id.*

[¶43] The district court found Ms. Eaton's own testimony belied any assertion an agreement was formed between the parties.  It found her testimony indicated the dealings between her and Mr. Iversen were "their evolving personal relationship that result[ed] in the assistance they rendered one another, financial or otherwise."  Viewing the evidence in the light most favorable to the Estate, we find the district court's decision is supported by the record.

[¶44]   For an oral contract to exist, its essential terms must be defined with certainty. *Fuger v. Wagoner*, 2020 WY 154, ¶ 11, 478 P.3d 176, 181–82 (Wyo. 2020); *Fowler*, 933 P.2d at 504.   Courts do not have the power to supply the terms of an agreement, so an oral agreement is unenforceable unless the contract terms are "so certain that the court can require the specific thing agreed upon to be done." *Fowler*, 933 P.2d at 504; *Rialto Theatre, Inc. v. Commonwealth Theatres, Inc.*, 714 P.2d 328, 334–35 (Wyo. 1986) (finding a lease agreement without definite terms is an agreement to agree in the future which the court could not enforce because it would require the court to supply the terms of the agreement).

[¶45]   Ms. Eaton testified she negotiated an oral agreement between her and Mr. Iversen in April 2012.  She stated the agreement required her to execute a lease to rent Mr. Iversen's townhouse, but Mr. Iversen orally agreed she could provide "in kind" services in lieu of rent.  She testified that she executed a written lease to pay $708 per month, but she never paid any rent in monetary value to Mr. Iversen.  Ms. Eaton stated in 2015, she and Mr. Iversen renegotiated their original agreement, and it was her understanding that she would receive his entire estate if she continued to provide care for him and kept him out of a nursing home.  However, according to Ms. Eaton's testimony, Mr. Iversen's fear of being placed in a nursing home in 2013 prompted him to agree to pay her for caregiving services "to keep that from happening."  This undermines her contention that his fear of being placed in a nursing home led to a renegotiated agreement in 2015.

[¶46]   Ms. Eaton did begin to help Mr. Iversen with his care beginning in Spring of 2012.  Around this same time, Mr. Iversen began helping Ms. Eaton financially, which included paying for her personal items, medical appointments, car repair, utilities, gas, and adding her as a beneficiary to his certificate of deposit.  Ms. Eaton could not recall whether the type of care she provided for Mr. Iversen changed before or after their agreement was allegedly modified in 2015 to include giving her his entire estate.  Her own testimony shows there was never any agreement for her to receive Mr. Iversen's entire estate.  She admitted to stating to Mr. Iversen's medical providers that once he passes away, "she will have 'nothing, no income, no job and no house' as they live off his retirement."  Ms. Eaton further acknowledged it was her obligation under the alleged oral agreement to keep Mr. Iversen out of a nursing home, but she did put him in a nursing home in 2017.

[¶47]   The only evidence that an oral contract existed came from Ms. Eaton.  She did not present any evidence that proved the essential terms of the contract.  Her testimony instead showed this oral agreement was constantly changing and never had any specific terms other than for her to keep Mr. Iversen out of the nursing home.  In the absence of written or definite contractual terms, the evidence establishes Ms. Eaton only had an expectation of inheriting Mr. Iversen's entire estate.  The record supports there was no oral agreement, but instead an evolving personal and gratuitous relationship between Mr. Iversen and Ms. Eaton. *See generally Fowler*, 933 P.2d at 504 (reversing the trial court's decision an oral contract existed between a father and son because the terms of the alleged oral contract were not sufficiently definite).  The district court's decision is not contrary to the weight

of the evidence.

### III. Ms. Eaton's Claim for Unjust Enrichment

[¶48] Alternatively, in the absence of an enforceable contract, Ms. Eaton claims she is entitled to the reasonable value of the services she rendered under the doctrine of unjust enrichment. "Unjust enrichment (or quantum meruit) is an equitable remedy which implies a contract so that one party may recover damages from another." *Elec. Wholesale Supply Co. v. Fraser*, 2015 WY 105, ¶ 27, 356 P.3d 254, 261 (Wyo. 2015) (quoting *Bowles v. Sunrise Home Ctr., Inc.*, 847 P.2d 1002, 1004 (Wyo.1993)).

> Unjust enrichment is the unjust retention of a benefit to the loss of another. It exists as a basis for recovery for goods or services rendered under circumstances where it would be inequitable if no compensation was paid in return. In Wyoming, the elements of unjust enrichment are: 1) valuable services were rendered; 2) to the party to be charged; 3) which services were accepted, used and enjoyed by the charged party; and 4) under circumstances that reasonably notified the party being charged that the other party would expect payment for the services.

*Symons v. Heaton*, 2014 WY 4, ¶ 15, 316 P.3d 1171, 1176 (Wyo. 2014) (quoting *Redland v. Redland*, 2012 WY 148, ¶ 137, 288 P.3d 1173, 1203 (Wyo. 2012)) (internal citations omitted).

[¶49] The district court held the evidence did not support an equitable remedy. It acknowledged Ms. Eaton provided valuable services to Mr. Iversen, and Mr. Iversen accepted those services and benefitted from them. However, the district court held "there is no rational view of [the] evidence upon which to conclude [Mr. Iversen] would have known or even guessed" Ms. Eaton expected payment in the form of his entire estate. The district court found Ms. Eaton "received incalculable benefit[s] in the form of food, housing, transportation, and did so during and due to her personal relationship with [Mr. Iversen]." Further, the district court found equitable remedies were not available because of Ms. Eaton's own wrongful conduct. It held: "it is uncontroverted that she dealt with [Mr. Iversen's] assets after his death without authority in cashing checks immediately, and in the unlawful transfer of property."

[¶50] When acting in equity, the district court is limited to only fashioning relief within the context of a recognized equitable theory. *Jacoby v. Jacoby*, 2004 WY 140, ¶ 10, 100 P.3d 852, 855 (Wyo. 2004). "A trial court's conclusions on issues of equity are factual determinations," which will not be set aside unless they are clearly erroneous. *Roussalis v. Apollo Elec. Co.*, 979 P.2d 493, 496 (Wyo. 1999); *Redland*, 2012 WY 148, ¶ 48, 288 P.3d

at 1185. "Unjust enrichment is an equitable remedy that is appropriate only when the party to be charged has received a benefit that in good conscience the party ought not retain without compensation to the party providing the benefit." *Symons*, 2014 WY 4, ¶ 16, 316 P.3d at 1176 (quoting *Redland*, 2012 WY 148, ¶ 146, 288 P.3d at 1205–06). Such "claims visualize a situation where a party receives something of value without payment, which was accepted and used so as to unjustly enrich the recipient of the goods or services." *Metz Beverage Co. v. Wyo. Beverages, Inc.*, 2002 WY 21, ¶ 36, 39 P.3d 1051, 1061 (Wyo. 2002). The district court is given considerable discretion in ruling on an unjust enrichment claim, and we will not disturb its ruling unless "it acts in a manner that exceeds the bounds of reason under the circumstances." *Elec. Wholesale Supply Co.*, 2015 WY 105, ¶ 29, 356 P.3d at 261–62; *Redland*, 2012 WY 148, ¶ 138, 288 P.3d at 1203; *Roussalis*, 979 P.2d at 496.

[¶51]   To succeed on her unjust enrichment claim, Ms. Eaton was required to show that the Estate would be unjustly enriched if it did not pay her for the services she rendered to Mr. Iversen. *Elec. Wholesale Supply Co.*, 2015 WY 105, ¶ 34, 356 P.3d at 263; *Jacoby*, 2004 WY 140, ¶ 12, 100 P.3d at 856. Wyoming law presumes that services rendered by one family member to another family member are gratuitous and not compensable. *Clark v. Gale*, 966 P.2d 431, 439 (Wyo. 1998). If two people live together in the same household, rendering services to one another, then in the absence of an express contract, the law presumes any benefit was payment in full and that neither individual intended to charge or accept payment for the services rendered. *Id.*; *Est. of Erickson*, 722 S.W.2d 330, 334 (Mo. Ct. App. 1986); 2 *Williston on Contracts* § 6:52 (4th ed., May 2022 update); 2 *Jones on Evidence* § 8:17 (7th ed., Jan. 2022 update); *Cf. Shaw v. Smith*, 964 P.2d 428, 438 (Wyo. 1998) (cohabiting parties can seek recovery for services rendered through theories of an implied contract and quantum meruit).

[¶52]   Ms. Eaton's relationship with Mr. Iversen began through her relationship with his parents and then evolved into a landlord-tenant relationship when she sought to rent his townhouse.  Ms. Eaton's relationship with Mr. Iversen evolved into a more personal relationship after his parents asked her to take Mr. Iversen to a medical appointment. Ms. Eaton continued to spend more time with Mr. Iversen, with both exchanging gratuitous services to one another.  Ms. Eaton helped Mr. Iversen with his care, and Mr. Iversen helped Ms. Eaton financially.  Mr. Iversen's medical records as early as 2013 refer to Ms. Eaton as Mr. Iversen's significant other, girlfriend, and fiancée/caregiver and state Mr. Iversen's living situation as "liv[ing] with fiancée in a private home in Cheyenne, WY." When testifying about her living situation in 2015, Ms. Eaton indicated she lived "out on the prairie," with Mr. Iversen, and was sometimes at Mr. Iversen's home 24/7.

[¶53]   From this evidence, the district court acted within its discretion when it found Ms. Eaton received an incalculable benefit due to her personal relationship with Mr. Iversen. We agree with the district court that Mr. Iversen's relationship with Ms. Eaton is one where the law presumes the services were rendered without the expectation of compensation.  The

evidence, when viewed in the light most favorable to the Estate, shows Mr. Iversen and Ms. Eaton maintained a family relationship, and both rendered services to one another. Ms. Eaton received compensation for her services through a place to live and financial assistance. We cannot say that Mr. Iversen was unjustly enriched, or that Ms. Eaton did not receive payment for her services during Mr. Iversen's lifetime.

[¶54] We further find the district court did not abuse its discretion when it held equitable remedies were not available to Ms. Eaton due to her own wrongful conduct. "One of the basic tenets of equity is that equitable remedies depend upon a showing by the claimant of clean hands." *Mantle v. N. Star Energy & Constr. LLC*, 2019 WY 29, ¶ 118, 437 P.3d 758, 797 (Wyo. 2019) (quoting *McNeill Family Tr. v. Centura Bank*, 2003 WY 2, ¶ 16, 60 P.3d 1277, 1284 (Wyo. 2003)). The doctrine of unclean hands is premised on the maxim that: "He who comes into equity must come with clean hands." *Roussalis*, 979 P.2d at 496. Under the doctrine, "a litigant may be denied relief by a court of equity on the ground that his or her conduct has been inequitable, unfair and dishonest, or fraudulent and deceitful as to the controversy in issue." 30A C.J.S. *Equity* § 111 (Oct. 2022 update). There is no fixed standard for conduct that amounts to unclean hands, "other than that it is conduct which the court regards as inequitable." *Mantle*, ¶ 118, 437 P.3d at 797 (citing Henry L. McClintock, *Handbook of the Principles of Equity* § 26, at 62 (2d ed. 1948)).

[¶55] Ms. Eaton was a signatory on Mr. Iversen's checking account and held a power of attorney that automatically revoked upon Mr. Iversen's death. Four days after Mr. Iversen's death, she deposited checks made out to Mr. Iversen but withdrew that amount in cash from his account. She transferred ownership of Mr. Iversen's properties to herself twenty-four hours prior to his death while he was incapacitated, after having admitted to hospital staff she would have no income or home upon his death. By making this transfer, Ms. Eaton breached the terms of Mr. Iversen's mortgage. Ms. Eaton should not profit from her own conduct, especially when her conduct was not in the best interest of the Estate. We affirm the district court's decision finding that Ms. Eaton is not entitled to an equitable remedy.

### IV. Quitclaim Deeds Transferring Property Pursuant to Power of Attorney

[¶56] On partial summary judgment, the district court granted the Estate's claims for quiet title and ejectment. It found Ms. Eaton's actions were done in an "effort to fulfill an oral will or alternatively . . . an inter-vivos transfer in satisfaction of an alleged contract to pay for her caretaking services." It found neither theory is valid under Wyoming law, and her actions were self-serving and not taken in the best interests of Mr. Iversen. On appeal, Ms. Eaton argues her belief she could execute the deeds under the power of attorney somehow creates a question of material fact, which precluded summary judgment. She further argues that the district court never determined whether she was authorized to execute the deeds through the grant of authority. The district court did however make such a finding when it found Ms. Eaton acted beyond the scope of the power of attorney. We agree with the

district court.

[¶57]   The Estate is entitled to summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Tram Tower Townhouse Ass'n v. Weiner*, 2022 WY 58, ¶ 43, 509 P.3d 357, 366–67 (Wyo. 2022) (quoting *Gowdy v. Cook*, 2020 WY 3, ¶ 21, 455 P.3d 1201, 1206 (Wyo. 2020)).   We review a district court's grant of summary judgment de novo, affording no deference to the district court's ruling. *Id.*; *Hanft v. City of Laramie*, 2021 WY 52, ¶ 32, 485 P.3d 369, 381 (Wyo. 2021).   We may affirm a summary judgment ruling on any basis found in the record. *Hanft*, ¶ 34, 485 P.3d at 381 (Wyo. 2021).   The record establishes, as a matter of law, Ms. Eaton had no authority to convey or create an interest for herself in Mr. Iversen's real property. We affirm the district court's decision on that basis.

[¶58]   We construe powers of attorney strictly, and an attorney-in-fact is only authorized to act within the limits prescribed under the power of attorney and by law. *Miller v. Life Care Centers of Am., Inc.*, 2020 WY 155, ¶ 19, 478 P.3d 164, 170 (Wyo. 2020).   An agent that has accepted appointment under a power of attorney is statutorily mandated to act "in good faith" and "only within the scope of authority granted in the power of attorney." Wyo. Stat. Ann. § 3-9-114(a)(iii) (LexisNexis 2019); *see also* Wyo. Stat. Ann. § 3-9-103(a) (LexisNexis 2019) (The Wyoming Uniform Power of Attorney Act applies to all powers of attorney unless it falls within one of the enumerated exceptions).   The power of attorney executed by Mr. Iversen granted Ms. Eaton "full and unlimited power to act on [his] behalf in the same manner as if [he] were personally present with respect only to the matters that [he] listed" in the document itself and only upon his incapacitation or disability, as certified by his physician.   Although Ms. Eaton is listed as Mr. Iversen's attorney-in-fact, Mr. Iversen never listed any matters for which she was permitted to act on his behalf.   Instead, the space on the power of attorney to fill in what powers he intended to grant Ms. Eaton was left blank and contains the notary stamp.   Therefore, the power of attorney explicitly limited Ms. Eaton's authority because Mr. Iversen did not grant her any powers to exercise on his behalf.

[¶59]   Ms. Eaton is statutorily prevented from creating or changing rights of survivorship, a beneficiary designation, or making a gift without the express authority granted in the power of attorney. Wyo. Stat. Ann. § 3-9-201(a) (LexisNexis 2019).   Furthermore, the Wyoming Uniform Power of Attorney Act bars her from granting herself an interest in Mr. Iversen's property unless explicitly authorized under the terms:

> [U]nless the power of attorney otherwise provides, an agent that is not an ancestor, spouse or descendant of the principal shall not exercise authority under a power of attorney to create in the agent, or in a person to whom the agent owes a legal obligation of support, an interest in the principal's property whether by gift, right of survivorship, beneficiary designation,

20

disclaimer or otherwise.

Wyo. Stat. Ann. § 3-9-201(b) (LexisNexis 2019); *Stutzman v. Office of Wyo. State Eng'r*, 2006 WY 30, ¶ 17, 130 P.3d 470, 475 (Wyo. 2006) ("Where the legislature uses the word 'shall,' this Court accepts the provision as mandatory and has no right to make the law contrary to what the legislature prescribed."); *see also* 2A C.J.S. *Agency* § 277 (Aug. 2022 update) ("Absent an express intention, an agent may not use his or her position for the agent's or a third party's benefit in a substantially gratuitous transfer. A general, durable power of attorney does not authorize an attorney in fact to transfer the principal's property to . . . herself unless the power of attorney specifically confers such power."). We find no provision in the power of attorney allows Ms. Eaton to confer upon herself an interest in Mr. Iversen's property. By application of the plain language of Wyoming Statutes § 3-9-201(a) and § 3-9-201(b), Ms. Eaton acted beyond the scope of her authority. The deeds executed by Ms. Eaton are therefore void and of no legal force or significance. *See Tram Tower Townhouse Ass'n*, 2022 WY 58, ¶ 87, 509 P.3d at 374 ("Where a party is without legal authority to convey title to property, the conveyance is void.").

## V. *Mitigation of Damages through Redemption of Mortgage*

[¶60]  The district court found the "Estate is entitled . . . to loss of rents and profits on real estate properties unlawfully transferred, in addition to the amounts revealed by the accounting ordered." In its original order the district court did not enter judgment against Ms. Eaton on the lost rents or profits, but instead ordered her to respond to the written demand for accounting within 30 days of December 19, 2019. Regarding the Dean Paul Drive townhouse, the district court found:

> 58.  During the period of time [Ms. Eaton] claimed ownership of the Dean Paul property under the subsequently invalidated deed, the mortgage came into default and it was eventually foreclosed and sold.
>
> 59.  The personal representative, daughter, once owned the Dean Paul property and provided the only estimate of its value, $90,000. At the date of foreclosure the mortgagee was owed $61,741 including legal fees and costs. Following public sale, the estate received $4,496 from excess sale proceeds above the amount due by reason of the foreclosure. The net loss in value to the estate was $23,763.

[¶61]  Ms. Eaton did not supply an accounting until five months after the district court entered its order and the Estate filed a motion for order to show cause. The district court held a contempt hearing on the accounting and entered judgment against Ms. Eaton. It

21

ordered Ms. Eaton to "[p]ay the shortfall . . . for the Dean Paul property in the amount of $23,763." On appeal, Ms. Eaton argues the Estate failed to mitigate its damages by redeeming the mortgage, and therefore the district court was precluded from awarding damages on the Dean Paul property.

[¶62] Ms. Eaton has not pointed to any place in the record showing she raised the issues of mitigation or the Estate's duty to redeem the mortgage before the trial court. "Our precedent is clear that an argument may not be made for the first time on appeal." *Gumpel v. Copperleaf Homeowners Ass'n, Inc.*, 2017 WY 46, ¶ 32 n.7, 393 P.3d 1279, 1290 n.7 (Wyo. 2017); *Matter of Phyllis V. McDill Revocable Tr.*, 2022 WY 40, ¶ 22, 506 P.3d 753, 761 (Wyo. 2022) ("Issues raised for the first time on appeal generally will not be considered by this court unless they are jurisdictional or issues of such a fundamental nature that they must be considered."). "It is not the duty of this Court to scour the record to find confirmation of party assertions; it is the duty of the proponent to support their position with proper citation to the record." *Black v. William Insulation Co.*, 2006 WY 106, ¶ 21 n.4, 141 P.3d 123, 131–32 n.4 (Wyo. 2006); W.R.A.P. 7.01(f) (LexisNexis 2022). We, therefore, decline to consider Ms. Eaton's argument about mitigation of damages. *See generally Black*, ¶ 21, 141 P.3d at 132 (declining to consider an issue raised for the first time on appeal because there was nothing in the record establishing the claim was made to the district court).

## VI. *Judgment on Monthly Rent during Ms. Eaton's Possession*

[¶63] For her final issue, Ms. Eaton argues the district court acted beyond the scope of its jurisdiction when it ordered her to pay rent in the amount of $1,000 per month. She alleges the district court erred when it ordered the rent in a quiet title and ejectment action. Ms. Eaton's argument does not address the Estate brought a claim for accounting and requested entry of a judgment requiring Ms. Eaton to repay the Estate amounts lost through her actions in transferring property pursuant to the power of attorney. She further disregards the Estate's answer to her complaint, which states Ms. Eaton's equitable claims were barred by her unclean hands and entitled the Estate to damages for lost property and benefits.

[¶64] The district court found the Estate was entitled to judgment on the equitable accounting claim for lost rents and profits from the property she unlawfully transferred to herself. The district court did not render a judgment on those lost rents and profits until it held a two-day evidentiary hearing on June 23, 2020, and August 4, 2020. The record on appeal does not contain the transcript of the hearing proceedings from June 23, 2020, or a statement of the evidence under W.R.A.P. 3.03. Further, the record on appeal does not contain the parties' written closings, which the district court ordered the parties to submit to preserve the issues for appeal.

[¶65] The district court is vested with original jurisdiction for all causes of action in equity. Wyo. Const. art. V, § 10. Wyoming recognizes the equitable remedy of an

22

accounting may apply, especially when "the 'accounts between the parties' are of such a 'complicated nature' that only a court of equity can satisfactorily unravel them." *Bear Peak Res., LLC v. Peak Powder River Res., LLC*, 2017 WY 124, ¶ 76, 403 P.3d 1033, 1056 (Wyo. 2017); *Y-O Invs., Inc. v. Emken*, 2006 WY 112, ¶ 9, 142 P.3d 1127, 1130 (Wyo. 2006); *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 478, 82 S. Ct. 894, 900, 8 L.Ed.2d 44 (1962) (citing *Kirby v. Lake Shore & M.S.R. Co.*, 120 U.S. 130, 133–34, 7 S. Ct. 430, 432, 30 L.Ed.2d 569 (1887)). Our review is limited because of Ms. Eaton's failure to designate all relevant transcripts and the parties' written arguments, and her failure to provide cogent argument regarding the equitable claim of an accounting. Simply asserting the district court exceeded its jurisdiction or claiming there was insufficient evidence to support the claim does not make it an issue we can consider for the first time on appeal without a complete record. *See generally Rush v. Golkowski*, 2021 WY 27, ¶ 35, 480 P.3d 1174, 1182 (Wyo. 2021) ("Simply asserting that there is a constitutional violation does not make an issue fundamental in nature" and declining to consider an alleged due process claim when there was a lack of transcript). We, therefore, decline to address the argument any further. *See WyoLaw, LLC*, 2021 WY 61, ¶ 37, 486 P.3d at 975 (Court will not consider arguments unsupported by cogent argument and relevant authority); *Y-O Invs., Inc.*, 2006 WY 112, ¶ 9, 142 P.3d at 1130–31 (district court's decision to grant an equitable remedy of an accounting is reviewed for an abuse of discretion); *Lykins v. Habitat for Humanity*, 2010 WY 118, ¶ 11, 237 P.3d 405, 408 (Wyo. 2010) ("Lacking a transcript, or a substitute for the transcript, the regularity of the trial court's judgment and the competency of the evidence upon which that judgment is based must be presumed.").

## CONCLUSION

[¶66] Based on the record before us, we cannot find that the district court abused its discretion or acted contrary to law. We affirm the district court's entry of judgment against Ms. Eaton.